[Crim. No. 1707. First Appellate District, Division One.—June 28, 1933.]

THE PEOPLE, Respondent, v. J. W. HALL et al., Appellants.

Leo A. Sullivan and J. L. Royle for Appellants.

U. S. Webb, Attorney-General, and Siebert L. Sefton for Respondent.

TYLER, P. J.—Appellant Hall, *alias* E. C. Rice, was jointly tried and convicted with Thomas J. Lewis, *alias* Leo A. De Grasse, of the crimes of attempt to commit grand theft and conspiracy to commit the same. This appeal is from the final judgment of conviction and from orders denying each of defendants a motion for a new trial. As one of the points relied upon for a reversal is that there was no proof of falsity of alleged representations, a somewhat extensive review of the evidence becomes necessary.

Defendant Lewis, operating under the assumed name of Leo A. De Grasse, introduced himself to one Frank W. Stine and his wife, who were traveling in their automobile across the continent. Lewis presented his card, which indi-

cated he was a director of the Fox Film Company. Upon arriving in Oakland Lewis suggested that they all stop at a certain hotel. This they did. Shortly thereafter, while Stine and his wife were sitting in the lobby talking to Lewis, appellant Hall appeared and was introduced to the Stines as a betting commissioner for a rich man. Lewis and Hall, in the presence of Stine and his wife, then began talking about betting on horse-racing. Hall stated that he had been in the business for thirty-one years and had never lost a bet, as the people he worked for had a private wire whereby they knew ten minutes before each race the horses on which to bet. Lewis asked Hall if he could give him a tip on a race or make a bet for him so that he might make some money. Hall explained that he was not permitted to make any wagers for himself but that if Lewis wished to bet, he, Hall, would advise him which horse would win. Thereupon Lewis was informed what horse would win a certain race, and Hall gave him his supposed membership card so that Lewis might enter the ''Exchange'' and make his bet. Lewis took the card and disappeared. He returned in a few minutes and stated he had made his bet, and later showed a sum of money which purported to be the amount he had won. Another bet was made and won, and then Hall stated that the people operating the ''Exchange'' were reluctant to take bets as small as $1500 and that he was going to make a larger one. Hall thereupon handed Lewis what purported to be a credit slip for $50,000, together with the amount of their previous purported winnings, and told Lewis to bet the amount on a certain horse. Lewis returned and stated he had made the bet. Hall then left and shortly afterward returned with the information that they had won $103,300. The membership card was then given to Lewis with instructions to collect the winnings, together with the amount bet, or $153,300 in all. Upon his return Lewis produced a draft for $153,300, which he claimed the ''Exchange'' issued to him and informed Hall and the Stines that the people at the ''Exchange'' demanded, before cashing the draft, that the winner would have to produce $50,000 in money in order to prove that this sum could be collected by the ''Exchange'' if the horse they bet on had lost. Hall then stated that he could easily produce the sum, stating he had a rich uncle in the east who would advance him the money. He then

left, ostensibly to telegraph this uncle. Upon his return he stated that his relation had left on a vacation and could not be located. He produced certain telegrams in support of his statement. At this time a third man, representing himself as the manager of the "Exchange", appeared upon the scene with a brief case, supposed to contain money, and stated that if Hall would sign the credit slip he would pay the bet. Hall refused, giving as a reason that he did not want his employer to know he was betting on his own account. Later Hall suggested to Lewis and the Stines, who had been present during all of these supposed transactions, that they raise the money between themselves. The Stines were asked what amount they could supply and they stated $10,000. Hall replied that this amount would be sufficient, as he and Lewis could raise the balance. It was agreed that by reason of this arrangement each party was to receive one-fourth of the profits. It was then suggested that Stine leave by airplane for his home in Massachusetts and return with the money. Stine left, and upon arriving at his destination he related the transaction to his brother-in-law. Becoming suspicious, he visited New York City and ascertained from the Fox movie people that Lewis had no connection with the company. Certain other inquiries were made by him which confirmed his suspicion that the transaction was a fraudulent scheme. On his way back to Oakland Stine informed the police authorities at Chicago of the facts and they telegraphed to the police department at Oakland. Upon arriving in Oakland Stine was met by Hall and Lewis. Stine informed them he had the money and offered what purported to be the amount he was to furnish. They refused to take it until such time as they could produce the amounts they were to raise under the arrangement. The police, who had secreted themselves in the hotel, then arrested appellants. When searched there were found on the person of Lewis cards bearing the name of Leo De Grasse which indicated he was a director of the Fox Picture Corporation. In searching Hall's room at a different hotel, where he was registered as E. R. Hill, the officers found his grips packed, indicating that he was about to depart. They found the black grip that the supposed manager of the "Exchange" had used, and also blank credit slips of the same character as the one used by appellants to represent

the $50,000 credit. Other documents of an incriminating nature were also found, among which were the purported telegrams and the answers thereto which Hall had used in his pretended endeavor to get in touch with his uncle. These telegrams were proved by officers of the telegraph companies not to have been sent or received by their companies. A check protector that had been used on the draft. of $153,300 was found and also a typewriter upon which the various documents had been prepared. At the trial, for the purpose of proving guilty intent, it was shown that Lewis had fraudulently obtained the sum of $12,000 from a victim of his operations, which sum was procured by him under precisely the same circumstances herein involved. We think sufficient of the facts are related to show the character of the misrepresentations.

 Appellants first urge as ground for reversal that there was no proof of the falsity of the alleged representations. In support of this contention it is claimed that the offense was built around the statements to Stine that there was a turf exchange in Oakland, in which and through which one of the defendants operated, so that he could place bets with certainty of winning, and there was no proof indicating there was not such an exchange or that defendant Hall did not obtain and receive advance information of fixed horse-racing precisely as he had represented. The contention is without merit. The existence or nonexistence of the "Exchange" was but one of the representations made by appellants. Moreover, the finding of the membership card and the draft for $153,300, which was supposed to have been issued by the "Exchange", the $50,000 credit slip supposed to have been deposited with the "Exchange" and which it was represented had to be made good, together with other documents all proved to have been written by Hall himself to accomplish the fraudulent scheme, were sufficient to raise the inference that no such institution as the "Exchange" existed; that it was a fictitious entity existing only in the minds of Hall and Lewis.

 It is next contended that the indictment was insufficient for the reason that it was not directed against innocent parties. In support of this contention we are cited to cases to the effect that neither the law nor public policy designs the protection of rogues in their dealings with each

other in dishonest practices, the policy being to protect those who for some honest purpose are induced, upon false and fraudulent representations, to give credit or part with their property to another, and not to protect those who for unworthy or illegal purposes part with their goods. (*McCord* v. *People,* 46 N. Y. 470.) The doctrine announced in the case cited has been expressly rejected by our Supreme Court in the case of *People* v. *Martin,* 102 Cal. 558 [36 Pac. 952]. It is there declared that if the party defrauded is also guilty of a violation of the law, he, too, should be prosecuted rather than his offense should serve as a shield to another's crime. . The offense is committed against the public and not against the individual. There is no principle of law that will bar the state from prosecuting a criminal because some other person is a *particeps criminis.* Moreover, Stine did not and could not under the circumstances commit any offense, whatever his intent might have been. The entire representations were false and no bets were ever made, the "Exchange" being a fictitious entity. (*People* v. *Martin, supra.*)

█ The final contention is made that the attempted entrapment by the prosecuting witness and the police officers, by aiding and urging the commission of crime, terminated the conspiracy, because the offering of the money, with the request that appellants accept the same, was by consent. The crimes for which appellants were tried and convicted were that of an attempt to commit grand theft and conspiracy to commit the same. The crimes originated in the minds of defendants and they were practically consummated when the arrest was made. █ It is only when the criminal intent originates in the mind of the entrapping person, and the accused is lured into the commission of the offense in order to prosecute him, that the entrapment will constitute a defense. Here, as shown by the evidence, the conspiracy originated in the minds of appellants and the acts of the officers merely amounted to apprehension of appellants, and did not constitute such an entrapment as is prohibited. (*People* v. *Malone,* 117 Cal. App. 629 [4 Pac. (2d) 287]; *In re Wong Poy,* 113 Cal. App. 677 [298 Pac. 1029].)

The judgment and orders denying a new trial are affirmed.

Knight, J., and Cashin, J., concurred.