[Crim. No. 5513. In Bank. Dec. 18, 1953.]

THE PEOPLE, Respondent, v. RAYMOND M. BRADDOCK, Appellant.

796

Isaac Pacht, Arthur F. Larrabee and Rudolph Pacht for Appellant.

Edmund G. Brown, Attorney General, and Michael J. Clemens, Deputy Attorney General, for Respondent.

EDMONDS, J.—Raymond M. Braddock was tried by the court without a jury upon an information charging him with four violations of section 11163 of the Health and Safety Code.* He has appealed from a judgment of conviction upon each count and from an order denying his motion for a new trial. Braddock asserts that a material variance exists between the information and the proof. Another point relied upon by him is that the evidence, as a matter of law, shows the commission of the offenses as a result of entrapment.

The four counts are in substantially the same language, except for the date of the alleged offense. Each of them

---

*Section 11163 provides: "Except in the regular practice of his profession, no person shall prescribe, administer, or furnish, a narcotic to or for any person who is not under his treatment for a pathology or condition other than narcotic addiction, except as provided in this division."

charges that Braddock, a licensed doctor of osteopathy, "did willfully, unlawfully and feloniously prescribe a narcotic, to wit, methadon, to E. J. Mantler, a person not under his treatment for a pathology." Mantler, an inspector for the Bureau of Narcotic Enforcement, was the principal witness for the People. The defendant did not testify and presented no evidence.

The record shows the following facts:

In the company of one Grimes, a person addicted to the use of narcotics, Mantler went to Braddock's residence and was introduced to the doctor as "Roy Bates." Mantler said to him, "I was hoping you could help me out with my wife." Braddock asked, "What kind of medicine does your wife use?" Mantler replied, "Well, she has used lots of different kinds in the last couple of years." Asked if he could bring her to the doctor, Mantler stated that it would not be convenient or practical. They discussed other subjects for a few minutes, and then the doctor said, "Oh, well, let's go inside and I'll write her one."

The three men entered the house, where Braddock seated himself at a table and produced a prescription book. At that moment, one Thomas, known by Mantler to be a narcotic addict, appeared at the front door. Grimes left the room and engaged Thomas in conversation, and they disappeared from Mantler's view. Braddock asked Mantler for his wife's name and was given the fictitious one of "Julia M. Bates." "You say she used methadon?" Braddock asked. Mantler answered, "Yes, and demerol." Braddock said, "I think methadon is better."

Told by Mantler that "shots" were preferable to tablets, the doctor wrote a prescription for 120 cubic centimeters of methadon to Julia M. Bates at a fictitious address supplied by Mantler. "She has T. B.?" he asked. Receiving an affirmative reply, he wrote those initials upon the prescription form. "How much do you want for the favor?" asked Mantler. Braddock replied, "How much have you got?" Mantler told him that he had $30. Braddock said, "I will take half of it. That will give you enough to get along on." Mantler gave him the money and departed.

Mantler had the prescription filled, although with difficulty because of the quantity of the drug indicated. When he received the substance, he gave it to a chemist for analysis. Testifying as an expert, the chemist stated that methadon is a manufacturer's name for amidone, a narcotic enumerated

in section 11001 of the Health and Safety Code, and included within the provisions of section 11163.

About 10 days later, Mantler again visited Braddock's home. After some preliminary conversation, he remarked, "My wife is not too good." Braddock said, "What was it she is using, delaudid?" Mantler stated that it was methadon. The doctor said, "That is not as bad as some stuff." He left the room and returned with a prescription book. "Give me a run down on her again. I can't seem to remember it." Mantler answered, "Well, she has been using it a couple of years now." "Is she bad when she doesn't have it?" asked the doctor. "She sure is," Mantler replied. "She nearly runs me up the chimney."

Braddock made the notation, "T. B." on the prescription form and asked Mantler what else was wrong with his wife. Mantler told him that she had an "old hysterectomy." The doctor said, "Oh yes. How much of these are you using?" Mantler looked at Braddock and said, "Not me, Doc. I am not using any. I have got enough trouble." Braddock remarked, "I never use anything but alcohol. Morphine makes me very odd." He then stated, "We won't have any trouble as long as you keep this far apart." Mantler assured him that he would try to do so. In payment, the doctor accepted $10, and said, "I ought to see this patient some time." After further conversation, he continued, "Give me a call some time when you are sure your wife will be home and I will drop in. I should see the patient."

About a week later, Mantler visited the doctor's home for the third time. He entered the house and was invited to sit down. After writing a prescription to Julia M. Bates for a quantity of methadon, he said, "You are kind of shortening up the time." Mantler replied, "Well, Doc, it is not holding. It doesn't last." The doctor said, "I don't want you to come here before ten days." He again advised Mantler to wait 10 days, and accepted $10 for the prescription.

On his fourth visit, Mantler was accompanied by inspectors from the Bureau of Narcotic Enforcement and from the Board of Osteopathic Examiners. The other men waited outside. Producing a prescription book, the doctor asked him the date and how he was getting along. Mantler answered that things were "pretty tough" and that he was having trouble "getting along with it." He paid the doctor $10 after receiving the assurance that, if the prescriptions were kept at least 10 days apart, they would have no trouble.

As he left the house, Mantler handed the prescription to Blanchard, one of the other officers. Blanchard entered, identified himself, and asked to see Braddock's records. When he questioned Braddock as to the identity of Julia Bates he was told that she was an old patient who had a post pregnancy condition and a hysterectomy. Braddock added that he had first contacted her when called to her home. Blanchard said, "Now, as a matter of fact, Doctor, have you ever seen Julia Bates?" The doctor admitted that he had not.

Blanchard told Braddock that the person who had been obtaining prescriptions from him under the name of Julia Bates in fact was an inspector from the Bureau of Narcotic Enforcement. He asked the doctor why he had been writing false and fictitious prescriptions and was told, "Well, I am in financial straits and I need the money." "Do you admit then that you have been violating the State and Federal Narcotic Laws in the sale of these narcotics?" he asked. Braddock replied, "Certainly, you have got the evidence on me; what is the use of denying it?" Thereafter, Mantler returned to the house, identified himself to the doctor, and showed him his credentials.

Braddock's claim of a material variance is based upon an alleged conflict between the information, which charges that he prescribed narcotics to E. J. Mantler in violation of section 11163 of the Health and Safety Code, and the evidence, which shows that the prescriptions were made out to Julia M. Bates, a fictitious person.

An information is formally sufficient if, in substance, it charges the defendant with the commission of a public offense in words "sufficient to give the accused notice of the offense of which he is accused." (Pen. Code, § 952.)

To be material, a variance between the information and proof must be "of such a substantive character as to mislead the accused in preparing his defense, or . . . likely to place him in second jeopardy for the same offense." (*People* v. *Williams,* 27 Cal.2d 220, 226 [163 P.2d 692] ; *People* v. *Amy,* 100 Cal.App.2d 126, 127 [223 P.2d 69] ; *People* v. *Moranda,* 87 Cal.App.2d 703, 705 [197 P.2d 394].)

In substance, the charges against Braddock are based upon transactions by which he sold narcotic prescriptions to Mantler, ostensibly for the use of another person, neither of them being under his treatment for a pathology. The true identity of the man supposed to be the husband of Julia M. Bates was made known to Braddock both by Inspector Blan-

chard and by Mantler himself, and Braddock was present when Mantler testified at the preliminary hearing. That testimony included in detail the circumstances surrounding the writing of the prescriptions, with the dates and places of those events and the names used, and it was sufficient to notify him of the particular circumstances of the offense charged in the information. (*People* v. *Roberts*, 40 Cal.2d 483, 486 [254 P.2d 501].) Furthermore, by stipulation the evidence against Braddock was presented by a transcript of the proceedings upon the preliminary hearing with only a slight amount of additional testimony. Braddock could not have been misled.

If Braddock should be tried again on a charge of violating section 11163 for any of the acts which form the bases for the present prosecution, he may show former jeopardy by evidence produced in that proceeding. "It is well settled that on a plea of double jeopardy, extrinsic evidence is admissible on the trial to identify the crime of which the defendant has been convicted." (*People* v. *Williams, supra,* 27 Cal.2d at p. 226.)

Braddock contends, however, that the evidence does not support the charge that he violated section 11163 of the Health and Safety Code, in that the narcotics were prescribed for a fictitious person. Although the evidence shows a violation of section 11165 of that code,* a misdemeanor, the argument continues, a violation of section 11163, which is a felony, requires that he "prescribe, administer, or furnish" the narcotic to an existing person.

It is questionable whether an accused properly may be convicted of a violation of section 11165 when the evidence does not show that he knew, or should have known, that the person for whom a prescription is written is nonexistent. But even if punishable under that section, it does not follow that such act may not also amount to a violation of section 11163. To hold otherwise would be to permit a physician freely supplying narcotics for illegitimate purposes to prevent being convicted of a felony by the simple device of writing a prescription for a fictitious person. No such result could have been intended by the Legislature.

The decision in *People* v. *Whitlow*, 113 Cal.App.2d 804 [249 P.2d 35], is not contrary to this conclusion. In that case, the defendant was accused of violating section 11163,

*Section 11165 states: "No person shall issue a prescription that is false or fictitious in any respect."

but upon motion the offenses charged were reduced to misdemeanors under section 11165 as lesser included offenses. Upon appeal, the judgment of conviction was reversed upon the ground that a violation of section 11163 does not necessarily include a violation of section 11165. However, the court did not hold that conduct proscribed by the former section may never be included within the prohibitions of the latter one.

█ The apparent purpose of section 11163 is to regulate the conduct of those persons who, in the practice of their professions, have access to legitimate sources of narcotics. The responsibility of such a practitioner is to prescribe narcotics for legitimate medical purposes. (Health & Saf. Code, § 11162.5.) "A physician may prescribe for, furnish to, or administer narcotics to his patient when the patient is suffering from a disease, ailment, injury, or infirmities attendant upon old age, other than narcotic addiction.

"The physician shall prescribe, furnish, or administer narcotics only when in good faith he believes the disease, ailment, injury, or infirmity, requires such treatment." (Health & Saf. Code, § 11330.)

If the object of section 11163 were to protect persons not under a physician's treatment for a pathology from faulty diagnosis or improvident administration of narcotics, it might be material in a prosecution under that section to show whether the person named in the prescription exists. But that is not the purpose of the statute. It seeks instead to prevent one having access to narcotics from making them available, other than for a legitimate purpose, to one under treatment for a pathology.

█ From the evidence it might reasonably be inferred that Braddock intended that the narcotics go to the person identified to him as Julia M. Bates. Also tenable is the inference of his intention that the narcotics be used by Mantler. Despite Mantler's assurances that he was not using the drugs, Braddock might have believed that he was the addict, as shown by his references to Mantler's "shortening up the time" between prescriptions and his advice to avoid more dangerous drugs. In either event, however, the conviction must be affirmed, since the gist of the offense was Braddock's action in writing a prescription for a narcotic for a person not under treatment for a pathology.

Finally, Braddock contends that the evidence, as a matter of law, shows unlawful entrapment. From the testimony of Mantler, he argues, it appears that the sales of prescriptions were made by him as the result of Mantler's inducements. The crime originated in the mind of Mantler, says Braddock, and except for the officer's persuasion, fraud and trickery, the offenses would not have been committed.

The many decisions in this state which define the defense of entrapment were reviewed in *People* v. *Lindsey*, 91 Cal.App.2d 914 [205 P.2d 1114], and the law stated as follows: "Where the doing of an act is a crime, regardless of the consent of anyone, the courts are agreed that if the criminal intent originates in the mind of the accused and the offense is completed, the fact that an opportunity was furnished, or that the accused is aided in the commission of the crime in order to secure the evidence necessary to prosecute him therefor, constitutes no defense. (Citations.) If the officer uses no more persuasion than is necessary to an ordinary sale, and the accused is ready and willing to make the sale, there is no entrapment." (P. 917.) More recently it was held: "It is not the entrapment of a criminal upon which the law frowns, but the seduction of innocent people into a criminal career by its officers is what is condemned and will not be tolerated. Where an accused has a preexisting criminal intent, the fact that when solicited by a decoy he committed a crime raises no inference of unlawful entrapment." (*People* v. *Schwartz*, 109 Cal.App. 2d 450, 455 [240 P.2d 1024]; quoted with approval in *People* v. *Roberts, supra*, at p. 489; accord *People* v. *Makovsky*, 3 Cal.2d 366, 369 [44 P.2d 536]; *People* v. *Branch*, 119 Cal.App.2d 490, 494 [260 P.2d 27]; *People* v. *Alamillo*, 113 Cal.App.2d 617, 620-621 [248 P.2d 421]; *People* v. *Crawford*, 105 Cal.App.2d 530, 537 [234 P.2d 181].)

In the present case, although Mantler had stated that his fictitious wife used "lots of different kinds" of medicines, it was Braddock who suggested a prescription, and it was he who first mentioned a narcotic. Braddock's suggestion of "T.B." came after the initial prescription had been written and without any previous description by Mantler of the nature of his wife's illnesses. Despite the complete lack of any suggestion by Mantler that the drugs were to be used for an improper purpose, Braddock advised him to wait a sufficient time between prescriptions to avoid detection. Moreover, when placed under arrest, Braddock stated that

he had been selling prescriptions because he was in financial straits and needed the money.

 Entrapment "is a positive defense imposing upon an accused the burden of showing that he was induced to commit the act for which he is on trial" (*People* v. *Schwartz, supra,* at p. 455; *People* v. *Grijalva,* 48 Cal.App.2d 690, 694 [121 P.2d 32]; *People* v. *Lee,* 9 Cal.App.2d 99, 109 [48 P.2d 1003]). Where the record shows a conflict in the evidence, the judgment will not be reversed. (*People* v. *Crawford,* 105 Cal.App.2d 530, 537 [234 P.2d 181].)

Braddock concedes that if the officer had asked to purchase a narcotic prescription for an unlawful purpose, there would be no basis for a defense of entrapment. He argues, however, that because Mantler made the purchases for a person supposedly ill, it must be concluded that the seller was persuaded to violate the law only because of sympathy. However, a person who violates the law by selling narcotics to an evasive purchaser is as guilty as one who supplies an addict more forthright in his demands. That Braddock was not misled is demonstrated by his studied efforts, entirely voluntary, to give a cloak of legality to the transaction.

 The testimony, read as a whole, shows Braddock to have been a willing seller to whom Mantler presented an opportunity to sell narcotics. By the judgment of conviction and the order denying the motion for a new trial, the trial judge determined that Braddock had not been entrapped into making the sales. For an appellate court to hold otherwise would require it to draw different inferences from the evidence which amply supports that determination.

The judgment and the order denying defendant's motion for a new trial are affirmed.

Gibson, C. J., Shenk, J., Traynor, J., and Spence, J., concurred.

CARTER, J.—I adopt as my dissent in this case the able and well reasoned opinion prepared by Mr. Presiding Justice Shinn which was concurred in by Justices Wood and Vallée when this case was before the District Court of Appeal, Second Appellate District, Division Three.

"Dr. Raymond M. Braddock was convicted in a nonjury trial of four violations of section 11163, Health and Safety

Code,[1] consisting of the issuance of four narcotic prescriptions on separate days for one who was not under his treatment. He was granted probation upon condition that he spend nine months in the county jail, his motion for a new trial was denied, and he appeals.

"The case was tried upon the transcript of evidence at the preliminary and some additional testimony at the time of trial. The case of the People rested upon the testimony of one Mantler, an inspector for the Bureau of Narcotic Enforcement, State of California. Defendant offered no evidence. Therefore, the evidence is unconflicting.

"Defendant urges the defense of entrapment and also claims there was a material variance in that the information charged that the medicine was prescribed to E. J. Mantler, whereas the proof showed that it was prescribed for a fictitious person, 'Julia Bates.'

"Simply stated, the rule as to entrapment is that the defense is valid when the intent to bring about the commission of the unlawful act originates in the mind of the entrapping person and the accused is lured into commission of an offense he would not otherwise have committed in order that he can be apprehended and prosecuted. (*People* v. *Hall*, 133 Cal.App. 40 [23 P.2d 783].)

"Mantler had himself introduced to Dr. Braddock by one Donald Grimes who, he testified, was a narcotic addict whom he had known for about a year. (There was no evidence that Grimes was known to the doctor to be a narcotic addict.) Grimes took Mantler to Dr. Braddock's residence and introduced him to the doctor as 'Roy Bates.' Mantler said he hoped the doctor would take care of his wife, to whom he gave the fictitious name of 'Julia M. Bates,' and he gave a false address for her. The doctor said he was supposed to see the patient and asked if she could be brought to him. The doctor asked what kind of medicine she used and Mantler said she had used all different kinds in the past two years. After a conversation about the doctor's dog and his cat, they entered the doctor's house and the doctor asked what it was Mantler wanted, whether his wife used Methadon and Mantler replied mostly Methadon or Demerol. A prescription was written and Mantler paid the doctor $15.

---

[1] "'§ 11163. Narcotic not to be prescribed etc., for person not under treatment. Except in the regular practice of his profession, no person shall prescribe, administer, or furnish, a narcotic to or for any person who is not under his treatment for a pathology or condition other than narcotic addiction, except as provided in this division.' "

During this time a man named Thomas came to the front door and Grimes went outside and spoke with him. Mantler testified Thomas was a narcotic addict in Los Angeles, but there was no evidence that the doctor was aware of that fact or even knew of the appearance of Thomas. Ten days later Mantler returned. He and the doctor visited in a friendly manner and in the conversation Mantler said he had been lucky in an unlawful poker game. He said his wife was not 'doing so good,' that she had run out of medicine but he had something for an emergency. The doctor asked if his wife gave trouble when she was short of medicine and Mantler said: 'She very nearly ran me up the chimney of the house on occasions.' The doctor wrote on his prescription book, 'T.B.' and said: 'What else is wrong with her, I have forgotten what you said the last time' and Mantler said: 'Well, she had an old hysterectomy a couple of years ago.' Mantler paid the doctor $10. About ten days later he went to the doctor again, and on another visit ten days later, when the doctor asked how he was getting along, Mantler told him that things were 'pretty tough.' Although Mantler testified that on the first occasion he did not tell the doctor what was wrong with his wife, it appeared from his cross examination that he had stated that she had 'T.B.' During the several visits the conversations were on a friendly basis and the doctor addressed Mantler as 'Roy.' Upon the second visit he asked Mantler to let him know when he could call upon 'Julia Bates' at her home, and upon different occasions inquired how she was getting on. On one occasion they watched a world series ball game on television, and upon the occasion of the second visit Mantler offered the doctor $20, but he refused to take more than $10. After Mantler obtained the first prescription it was known to other inspectors in the enforcement office that he had obtained it by false representations to the doctor that 'Julia Bates' was his wife and was in need of drugs. Upon Mantler's fourth visit defendant was arrested by Mantler and three other inspectors who seized all his prescription books and records.

"The only question which requires an answer may be stated as follows: When a narcotic officer conceives a plan to entrap a physician into a violation of the law, has himself introduced to the physician under an assumed name, represents that he has a sick wife who is using Methadon or Demerol (trade names), makes excuses for not bringing her to the doctor's office when told he should do so, ignores a

request by the doctor that he call upon her, and obtains prescriptions in a fictitious name given as that of his wife, may the doctor be lawfully convicted of violation of the law which forbids prescribing a narcotic for one not under his treatment? The question describes the case of Dr. Braddock and our answer is a negative.

"It is scarcely necessary to remark that the agent won the confidence of the doctor, who was soon calling him 'Roy' and making friendly inquiries concerning the supposed wife. He appeared as a man who was burdened with a sick wife, for whom he generously provided the drugs for the relief of her distress, when she was unable to visit the doctor. So the doctor issued the prescriptions for one not under his treatment, and as a consequence stands convicted of four counts of felony. But let us see what the agent did: He conceived the plan of inducing the doctor to commit a crime; he persuaded the doctor to issue false and fraudulent prescriptions and became accessory to four misdemeanors (§ 11165)[2]; he made false and fraudulent representations, a felony under section 11170[3]; he gave a false name and a false address for the pretended wife, a felony under section 11170.5[4]. This was entrapment. In all our searching we have not found a case in which a physician was made the victim of such deception. We cannot say that this is the first time a presumably law-abiding physician has been induced by false representations of a law enforcement officer to issue a prescription unlawfully, although we have been unable to discover another one. This satisfied us not only that such methods have not been found necessary in policing the medical profession in prescribing narcotics, but also that the employment of fraud and deception in the

---

[2] "'§ 11165. False or fictitious prescription. No person shall issue a prescription that is false or fictitious in any respect.'"

[3] "'§ 11170. Acts and statements prohibited. (1) No person shall obtain or attempt to obtain narcotics, or procure or attempt to procure the administration of or prescription for narcotics, (a) by fraud, deceit, misrepresentation, or subterfuge; or (b) by the concealment of a material fact.

"'(2) No person shall make a false statement in any prescription, order, report, or record, required by this division.

"'(3) No person shall, for the purpose of obtaining narcotics, falsely assume the title of, or represent himself to be, a manufacturer, wholesaler, pharmacist, physician, dentist, veterinarian, or other authorized person.

"'(4) No person shall affix any false or forged label to a package or receptacle containing narcotics.'"

[4] "'§ 11170.5. False name and address. No person shall, in connection with the prescribing, furnishing, administering, or dispensing of a narcotic, give a false name or false address.'"

entrapment of physicians has been very generally and properly scorned.

"There is, of course, much more involved here than the simple question whether Dr. Braddock violated the law. He stood mute, as was his right, and thus admitted the truth of Mantler's testimony. It is not because of a claim of innocence that he relies upon the defense of entrapment, but because it is the policy of the law not to punish violations initiated and induced by others for the purpose of bringing about a prosecution.

"If we were to uphold the conviction of Dr. Braddock it would mean that we were approving the unlawful enforcement of the law and giving a free hand to law enforcement officers to use not only deceitful means, but unlawful means, to entice physicians, and others as well, to violate the law. The courts have consistently refused to temporize with such fraud, deceit and direct violation of statutory law as the record here discloses. The agent provocateur, so despised that he has been given no name in our language and can claim no place in our society, had best have the door shut against him whenever he appears. Our courts have given no encouragement to his hateful practices, no foothold in our field of law enforcement from which to extend his contaminating influence.

"It was said in *Sorrells* v. *United States*, 287 U.S. 435 [53 S.Ct. 210, 77 L.Ed. 413, 418, 26 A.L.R. 249]: 'The Federal courts have generally approved the statement of Circuit Judge Sanborn in the leading case of *Butts* v. *United States* (C.C.A. 8th) 18 A.L.R. 143, 273 Fed. 38, *supra,* as follows: "The first duties of the officers of the law are to prevent, not to punish crime. It is not their duty to incite to and create crime for the sole purpose of prosecuting and punishing it. Here the evidence strongly tends to prove, if it does not conclusively do so, that their first and chief endeavor was to cause, to create, crime in order to punish it, and it is unconscionable, contrary to public policy, and to the established law of the land to punish a man for the commission of an offense of the like of which he had never been guilty, either in thought or in deed, and evidently never would have been guilty of if the officers of the law had not inspired, incited, persuaded, and lured him to attempt to commit it,"' and in the concurring opinion of Justices Roberts, Brandeis and Stone: 'There is common agreement that where a law officer envisages a crime, plans it, and activates its com-

mission by one not theretofore intending its perpetration, for the sole purpose of obtaining a victim through indictment, conviction and sentence, the consummation of so revolting a plan ought not to be permitted by any self-respecting tribunal. Equally true is this whether the offense is one at common law or merely a creature of statute. Public policy forbids such sacrifice of decency. The enforcement of this policy calls upon the court, in every instance where alleged entrapment of a defendant is brought to its notice, to ascertain the facts, to appraise their effect upon the administration of justice, and to make such order with respect to the further prosecution of the cause as the circumstances require. . . .

" 'The doctrine rests, rather, òn a fundamental rule of public policy. The protection of its own functions and the preservation of the purity of its own temple belongs only to the court. It is the province of the court and of the court alone to protect itself and the government from such prostitution of the criminal law. The violation of the principles of justice by the entrapment of the unwary into crime should be dealt with by the court no matter by whom or at what stage of the proceedings the facts are brought to its attention. Quite properly it may discharge the prisoner upon a writ of habeas corpus. Equally well it may quash the indictment or entertain and try a plea in bar. But its powers do not end there. Proof of entrapment, at any stage of the case, requires the court to stop the prosecution, direct that the indictment be quashed, and the defendant set at liberty. If in doubt as to the facts it may submit the issue of entrapment to a jury for advice. But whatever may be the finding upon such submission the power and the duty to act remain with the court and not with the jury.'

"It has been the settled policy of the courts to condemn and repudiate unlawful enforcement of the law. We shall refer to only a few of the many cases. One in which the accused was entrapped into procuring and selling a narcotic is *Cline* v. *United States*, 20 F.2d 494 (Eighth Circuit). A government narcotic agent arrested an addict but promised to release him if he 'made a case' for the agent. The addict, pretending to be greatly in need of the drug, persuaded a friend to induce a chauffeur to obtain morphine for him. The friend received the morphine from the chauffeur, paid him $5 and when he delivered the morphine to the addict in exchange for $5, was arrested and convicted in a jury trial. It was held on appeal that the evidence sustained only one

conclusion, namely, that the agent used the addict to trap the defendant.

"In *United States* v. *Healy*, 202 F. 349 (District Court, Montana) the accused unlawfully sold liquor to an Indian who was not known by him to be such, but who was used by government officers as a decoy. After conviction the judgment was set aside, the court saying: 'Though the seller has violated the statute, he was the passive instrument of the government, and his is a blameless wrong for which he cannot be justly convicted. . . . The practice cannot be tolerated, and a conviction for an offense so procured cannot stand.'

"In *United States* v. *Eman Mfg. Co.*, 271 F. 353 (District Court, Colorado), a government agent wrote the defendant enclosing $3 and requesting a case of a preparation claimed to be mislabeled. His purpose was to initiate a prosecution for an unlawful shipment in interstate commerce. Defendant, having made the shipment, was prosecuted and it was held, on the stipulated facts, 'that in the interests of a sound public policy the defendant should be found not guilty and discharged.'

"In *United States* v. *Lynch*, 256 F. 983, (District Court, New York) the Military Intelligence Department caused one Fancher to demand money for his influence in the award of a government contract and when money was offered to him by the defendant Lynch the latter was arrested and prosecuted for offering a bribe. The court said that under such circumstances the government was estopped from prosecuting on the ground that it caused and created that of which complaint was made. A verdict of acquittal was directed.

"In *United States* v. *Echols*, 253 F. 862 (District Court, Texas), a military police officer persuaded the accused to procure him a drink in order that he might arrest him therefor. The prosecution was dismissed although the defendant had offered to plead guilty. The court upheld the defense of entrapment and stated as follows (p. 863) : 'In what is here stated there is no intention to excuse persons who yield to temptation, or to hamper or limit the acts of officers of the law in detecting crime by any means or device; but the zeal to detect crime ought not to be so vigorous as to induce officers to originate and procure the commission of the very offenses which they are enjoined to prevent. No faithful officer of the law will be hampered, nor will any criminal be aided, by the observance of this rule. Its disregard, however, may, and likely will, subject to persecution and conviction weak

and spineless persons, who find it hard to resist temptation; and the government, through the zeal for conviction on the part of the arresting officer, may become the means of the ruin of its citizens, instead of their safeguard and protection. Such a possible result at once establishes the unimpeachable wisdom of the rule of public policy here enunciated, and requires that the plea of guilty, which the defendant offered to make, be by the court refused, and the case dismissed, which is accordingly now done.'

"*United States* v. *Mathues,* 22 F.2d 979 (District Court, Pennslyvania), was a similar case which stated and applied the rule of entrapment.

"The People contend that the case is the ordinary one of an officer appearing as a willing buyer of narcotics from one who is willing to sell to anyone offering himself as a customer. Cases of this sort are legion, conviction are the rule and reversals the rare exception. (*People* v. *Makovsky,* 3 Cal.2d 366, 369 [44 P.2d 536] ; *People* v. *Lindsey,* 91 Cal. App.2d 914, 916 [205 P.2d 1114] ; *cf. People* v. *Gallagher,* 107 Cal.App. 425 [290 P. 504] ; *Cline* v. *United States, supra,* 20 F.2d 494.) But this is because one who is willing to peddle narcotics is necessarily a criminal at heart, looking for no inducement to break the law other than the money he expects to receive. It is an inescapable inference in such cases that a willingness to violate the law existed and that the act of violation was self induced. Persuasion to make a sale does not taint the transaction with the vice of entrapment unless it induces the commission of an act that would otherwise not have been committed. (*People* v. *Makovsky, supra,* 3 Cal.2d 366, 370; *cf. Butts* v. *United States,* 273 F. 35 (Eighth Circuit 1921) ; *People* v. *Gallagher, supra,* 107 Cal.App. 425.) If this were such a case it would occupy but little of our time, for we would applaud and encourage every energetic and legitimate effort to stamp out the fearful and detestable traffic in narcotics.

"In *Sam Yick* v. *United States* (C.C.A. 9), 240 F. 60 [153 C.C.A. 96], at p. 65, the court stated: 'While it may be true that the mere aiding of one in the commission of a criminal act by a government officer or agent does not preclude the conviction of the party committing the crime, yet where the officers of the law have incited the party to commit the crime charged and lured him on to its consummation, the law will not authorize a verdict of guilty.' It is, of course, conceded that officer Mantler conceived the plan to induce Dr. Braddock

to commit a crime. The remaining question is whether, in the language of the Sam Yick case, the officer 'lured him on to its consummation,' and we shall see from a discussion of the undisputed evidence that Dr. Braddock was 'lured on' from start to finish.

"The question here is whether it could reasonably have been inferred from the facts in evidence that Dr. Braddock was willing to write prescriptions for anyone willing to pay a price, and that he was not induced and persuaded to write them by the representations of the officer. Such conclusions, in our opinion, would have been based on nothing more than suspicion. Mantler kept up his deception to the last. Nothing occurred to cast doubt upon his representations. The doctor asked to see 'Julia Bates' at his office and offered to call upon her at her home, but Mantler succeeded in persuading him that she could not be brought to the office and avoided the suggestion that the doctor call upon her. It was not shown that Dr. Braddock had ever before issued a prescription for a person who was not under treatment by him, or had otherwise violated the narcotic law. Mantler made no effort to obtain a prescription for himself. He evidently believed deception would be necessary and he played his role straight through. He was the agent of the state through whom the state acted. It should not be permitted the state to escape responsibility for the acts of its agent by merely saying that although he spoke falsely he was not believed, and that the doctor was not deceived by his falsehoods into doing some- thing he would not otherwise have done. Every reasonable inference is to the contrary. That the doctor believed the representations was evidenced by the fact that he acted upon them. That they were understood by Mantler to be the effective means of accomplishing his purpose was evidenced by the fact that he persisted in them and improved upon them to the point of arousing the doctor's compassion. If there was an intermixture of cupidity, this would not alter the legal aspects of the case. There is no pretense that the defendant was moved by purely charitable motives, or that he did not know he was violating the law, but this does not militate against the defense of entrapment. Defendant admitted to the officers, immediately after his arrest, that he had written the prescriptions because he needed the money, but this means only that he was the more easily persuaded. The defense of entrapment is not to be denied to the weak and needy. They

are the very ones who become the victims of persuasion and deceit, and who deserve protection.

"Defendant claims only that he was persuaded to violate the law and that the evidence supports his claim to the exclusion of any other reasonable conclusion. In answering this contention the People call attention to the testimony of Mantler that he had previously questioned defendant over the telephone and accused him of prescribing for addicts, which accusation defendant resented. Also, mention is made of the fact that Mantler testified that Grimes and Thomas were addicts, although it was not shown that defendant had knowledge of that fact or that he even knew the man Thomas. To give serious consideration to such self serving testimony and vaguely suspicious circumstances as incriminating evidence would only magnify the error of the conviction. The mere presence of Grimes and Thomas was not any sort of evidence that defendant was a law violator. If they were 'planted' there by Mantler, as they no doubt were, they could have been called as witnesses if they would have testified that defendant had prescribed for them unlawfully. It is therefore to be presumed that had they been called to testify as to their relations with defendants, if any, their testimony would have been adverse to the People. We therefore utterly reject the argument that as against this presumption the court could regard the presence of these men as an incriminating or even a suspicious circumstance. Moreover, the officers had seized and had possession of defendant's narcotic records. None was offered in evidence. The assertion of Mantler in the telephone conversation that defendant had been prescribing for addicts was not evidence. Defendant made no admission. His prescription books, which were required to contain copies of all prescriptions issued within two years (Health & Saf. Code, § 11166.10), were in the hands of the officers. It was to be presumed that if they had been produced in court they would not have disclosed anything favorable to the prosecution.

"This case takes on added significance from the fact that in the present day courts and juries must place great reliance upon the testimony of officers who are charged with the duty of enforcing the narcotic laws. It is of common occurrence that convictions are had, and are affirmed on appeal, upon the uncorroborated testimony of such officers, even in the face of strong denials by the accused. We do not doubt that confidence in the veracity and motives of the officers is generally

well deserved, and deem it somewhat more than unfortunate that any officer should stoop to falsehood and deceit in order to bring about the commission of a crime for the purpose of obtaining a conviction. It is shocking to learn that an officer of the law whose worth depends so much upon a high regard for the truth and a just regard for the rights of citizens should conceive and carry out a plan involving so much duplicity, and even more so that he should be assisted by other officers who were aware of the deception. That the narcotic laws are vigorously and systematically enforced we know from the multitudes of arrests that are made and the convictions that are had, but it is better that some offenders should go unpunished than that overzealous officers should be permitted to indulge in practices which would tend to demoralize the law enforcement agencies and impair the confidence and trust of the people and the courts which it is necessary for such agencies to possess in order to be most effective.

''This is clearly a case in which there was an entire absence of evidence and reasonable inference that the accused would have violated the law had he not been induced to do so by false representations and persuasion of a law enforcement officer. We do not believe that any conviction has been sustained on appeal upon such a record.

''In conclusion, we quote from *Woo Wai* v. *United States*, 223 F. 412, 415 [137 C.C.A. 604] : 'Some of the courts have gone far in sustaining convictions of crimes induced by detectives and by state officers. This is notably so of the decision in *People* v. *Mills*, 178 N.Y. 274 [70 N.E. 786, 67 L.R.A. 131]. But it is to be said, by way of distinguishing such cases from the case at bar, that in all of those cases the criminal intention to commit the offense had its origin in the mind of the defendant.'

''If the conviction of Dr. Braddock should be affirmed it would be the only case to be found in the books in which a conviction was allowed to stand upon undisputed evidence that an officer of the law conceived the commission of a crime, used misrepresentation, deceit and unlawful methods to induce its commission, and when all the evidence and the reasonable inferences were that but for the machinations of the officer the unlawful act would not have been committed.

''It is unnecessary to consider the question of variance between the information and the proof.

''The judgment and order denying a new trial are reversed.''

For the reasons stated in the foregoing opinion I would reverse the judgment.

Schauer, J., concurred.

Appellant's petition for a rehearing was denied January 14, 1954. Carter, J., and Schauer, J., were of the opinion that the petition should be granted.