[Crim. No. 7607. Second Dist., Div. Three. Nov. 28, 1961.]

THE PEOPLE, Plaintiff and Respondent, v. SHELLY EUGENE BLOCKER, Defendant and Appellant.

Richard M. Moore, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, and S. Clark Moore, Deputy Attorney General, for Plaintiff and Respondent.

FORD, J.—The appellant was accused of the crime of selling marijuana in violation of section 11531 of the Health and Safety Code. Three prior felony convictions were also alleged, two being for burglary and one being for conspiracy to commit pandering. In a nonjury trial, the appellant was found guilty of the offense charged; the allegations as to the prior convictions were found to be true. Having been sentenced to imprisonment in the state prison for the term prescribed by law, the appellant has appealed from the judgment and from the order denying his motion for a new trial.

The main contention of the appellant is that the evidence established the defense of entrapment as a matter of law. It is asserted that ''the evidence shows as a matter of law that appellant would not have committed this act but for the conduct of the police officer in inspiring and persuading appellant to make this sale in order to aid a mutual friend.'' The evidence pertinent to such contention will be stated.

It was stipulated that the case would be submitted to the trial court upon the testimony taken at the preliminary examination, together with such additional evidence as the parties should introduce during the course of the trial. At the preliminary examination, Aubrey Glenn Branson testified that he was a police officer for the city of Long Beach. On June 18, 1960, accompanied by a man he knew as ''Bob,'' the witness went to the Green Gardens Café in Los Angeles. Officer Branson wore ''levis, a black leather jacket and a red T-shirt''; his face was not shaven. Branson was introduced to the appellant Blocker. The officer asked Blocker for some ''weed.'' Blocker asked him how much he wanted. When inquiry was made as to the price of one pound, the appellant said that it was $80 but that Branson could get a kilo, ap-

proximately two pounds, for $110. The officer said, "It sounds like a good deal." It was then about 12:30 a. m. Blocker told Branson to wait, that he would go to see his "contact man" and would return to the café. At about 2:30 a. m. Blocker returned and said that he was unable to get the "weed," but that Branson should call him at about 9 a. m. at a telephone number which he gave to the officer. The officer was unable to reach Blocker on the telephone until about 5:30 p. m. The appellant then said he had a kilo and asked the officer to call him at another telephone number at "six o'clock sharp." Officer Branson made the call at 6 p. m.; the appellant said that his car would be parked behind a service station on the southwest corner of Central and Imperial Highway, and that Branson should place his car next to the appellant's vehicle. The officer went to that location and received a paper bag containing marijuana from the appellant. When he told the appellant he had $105, Blocker said, "You will still owe me $5 because it is $110." The officer handed the money to the appellant.

Blocker was arrested on July 28, 1960. Officer Branson talked to him at the Long Beach Police Station. The appellant then said that he did not "usually deal in narcotics" and had "only smoked two cigarettes." In reply to the inquiry of another officer as to his reason for making the sale to Officer Branson, he said, "I just wanted to do the guy a favor."

On cross-examination, Officer Branson testified that after he was introduced to the appellant Blocker, he said that he was a friend of a man whose name was Jimmy. He discussed with the appellant the fact that Jimmy was in jail in Long Beach. He then testified as follows: "Q. As a matter of fact, you asked the defendant to get you some narcotics so you could make some money in order to get Jimmy out of jail, isn't that correct? A. I did." The officer denied that he was the first one to mention narcotics to the appellant. The officer did not recall "exactly" how the discussion of that subject arose but he thought that Blocker asked, "What do you guys want up here? Are you looking for some weed?"

At the trial, Officer Branson was called to the witness stand for further cross-examination. He testified with reference to his first conversation with the appellant as follows: "Q. During this conversation I understand . . . the subject of marijuana came up. Do you recall whether or not you first brought the subject up or whether Mr. Blocker did, or some-

one else did? A. I recall now that I first brought the subject up. Q. How did you go about bringing it up? . . . A. Well, earlier I had overheard a phone conversation between Bob and Mr. Blocker about it.'' He said that he told the appellant Blocker that he had "scraped up $105 and . . . would like to purchase a kilo of marijuana.'' As to his conversation with the appellant, Officer Branson testified in part: ''Well, I asked Mr. Blocker was the marijuana good stuff, and he said yes. He said, 'It is the same stuff I sold Jimmy.' I think he said, 'Jimmy and Bob, it is the same stuff I sold them.' At this time I asked Bob, I said, 'How about it, is it any good?' He said, 'It is real good stuff.' Mr. Blocker said, 'This is the best weed that I have got ahold of.' '' The officer also testified that when the marijuana was delivered to him, he thought that the appellant said that he was "sick" at himself for "doing this.'' After this transaction, the officer made five or six telephone calls to the appellant.

On redirect examination, Officer Branson testified that as of June 18, 1960, he had been on the police force for about six months and had been doing this particular type of work for about two weeks. He further testified as follows: ''Q. Now, you stated that you were the first time—the first time marijuana came up in your conversation was when you mentioned this $105 for a kilo, is that right? A. That is right. Q. Now, you said you overheard a conversation though that the defendant engaged in, is that right? A. That is right. Q. Did that pertain to narcotics? A. Yes, it did. Q. Was that the thing that occasioned you then to come in with your conversation about $105 for a kilo? A. Yes, it is. Q. What was that conversation that you overheard the defendant engage in? A. I heard the defendant talking to Bob, the person that was with me, over the telephone. Q. What did he say? A. He said that he would sell a pound of marijuana for $80, that a kilo would cost $110. Q. You overheard that, is that right? A. Yes, I did.''

At the trial, the appellant Blocker testified in his own behalf. With respect to his first conversation with Officer Branson at the Green Gardens Café ''at approximately 7:30 to 8:00 o'clock in the evening,'' he testified in part as follows: ''Officer Glenn [Branson] said, he said, 'You heard what happened to Jimmy, didn't you?' I said, 'Yeah, I should know, he called me for the last three days in a row to get me to help him get out of jail.' He said, 'Yeah, that is what I am here for now, I am trying to help Jimmy get out.'

I said, 'What is happening?' He said, 'Well, if we can get some weed we can turn it over and have enough to put him on the ground.' I said, 'Well, I promised Jimmy I would do whatever I can, man, but I don't deal in narcotics. . . . I told him this and I got up from the table and started out the door. He followed me outside the door. He said, 'Look, is this still 105 a kilo? . . . I told him I didn't deal in narcotics.'' At 8 o'clock the next morning, the officer called the appellant, who told him, ''I told you last night that there wasn't nothing happening.'' The officer said he would call later. The appellant said, ''Okay, you do that.'' Officer Branson telephoned again at 1 o'clock, but the appellant told his wife to tell Branson he was not at home. At approximately 6 o'clock, Branson made another call; as to that conversation, the appellant testified in part as follows: ''. . . I told him that I didn't deal [in] narcotics but I would have promised Jimmy that I would do whatever I could for him, so I was going to call some people and see what I could do for him.'' He told the officer to call back in 15 minutes; the officer did so and arrangements were then made to meet at Central and Imperial Highway. When the marijuana was transferred to the officer, the appellant said, ''Man, I am sick of myself for even putting my hand on this stuff.'' He also said that he would himself pay the amount the officer was ''short'' and that he had promised Jimmy he would help him out. Thereafter, when he left the service station, he stopped his car on Imperial Highway, alighted from it and gave the money to the man who had brought the marijuana to him; that man was waiting in his automobile about 150 or 200 yards away on Imperial Highway. The appellant made no money on the transaction.

The appellant also testified that he gave his home telephone number to Jimmy, but not to the officer; it was not listed in the directory. He said that he sold the marijuana to Officer Branson because the latter told him ''that he wanted to sell this marijuana to make enough money to get Jimmy out of jail''; otherwise he would not have done so. On cross-examination, the appellant said that he did not remember Jimmy's last name or know where he lived; he was ''not a very good friend''; the appellant had known Jimmy for approximately three months. He was going to hire Jimmy to work for him.

Richard C. Grace, an officer attached to the State Bureau of Narcotic Enforcement, testified that he was in the vicinity of Central and Imperial Highway on the night of June 18,

1960, and observed the appellant. When the appellant left the premises of the service station, he went in a westerly direction on Imperial Highway; the officer followed him for about twelve blocks; the appellant made no stop in that distance.

In rebuttal, Officer Branson testified that he never stated to the appellant that he wanted him to get narcotics for him so that he, Branson, could help Jimmy. On cross-examination, the witness' attention was directed to his testimony at the preliminary hearing, hereinbefore quoted, to the effect that he did ask the appellant to get him some narcotics so that he could make some money to use in getting Jimmy out of jail. As to such testimony, Officer Branson stated: "My testimony is now that I did not tell the defendant that I wanted the narcotics in order to get Jimmy out of jail. . . . We discussed Jimmy, I know that. I had information that this person Jimmy had purchased narcotics from Mr. Blocker and that he had been arrested with these narcotics in his possession, and at the time I met Mr. Blocker we talked about Jimmy being in jail and myself, I never told Mr. Blocker that I wanted the narcotics to get Jimmy out of jail. Evidently in the preliminary I didn't understand the question."

 The law which must govern this court in the determination of the appellant's claim of entrapment is set forth in *People* v. *Sweeney,* 55 Cal.2d 27, at pages 48-49 [9 Cal. Rptr. 793, 357 P.2d 1049]: "In *People* v. *Makovsky,* 3 Cal. 2d 366, 369 [44 P.2d 536], we stated the rule in the following language: 'It is unquestionably true that decoys may not be used to ensnare the innocent and law-abiding into the commission of crime when the criminal design originates not with the accused but is conceived in the minds of officers, and the accused is by persuasion, deceitful representation or inducement lured into the commission of a criminal act. When an officer induces a person to commit a crime, which he would not have committed without such inducement, the law will not punish the person so lured into the crime. [Citation.] Under such circumstances the government is estopped by sound public policy from prosecuting therefor. The first duties of the officers of the law are to prevent, not to punish crime. It is not their duty to incite and create crime for the sole purpose of prosecuting and punishing it. While decoys may be used to entrap criminals and to present opportunity to one intending to commit a crime, they are not permitted to ensnare the innocent into the commission of a crime when the criminal design originates not with the

accused but is conceived in the minds of the officers, and the accused is by persuasion or inducement lured into a criminal act.'

"More succinctly we have stated the same rule in the following language: 'It is not the entrapment of a criminal upon which the law frowns, but the seduction of innocent people into a criminal career by its officers is what is condemned and will not be tolerated. Where an accused has a preexisting criminal intent, the fact that when solicited by a decoy he committed a crime raises no inference of unlawful entrapment.' (*People* v. *Braddock,* 41 Cal.2d 794, 802 [264 P.2d 521]; *People* v. *Roberts,* 40 Cal.2d 483, 489 [254 P.2d 501].) Again we stated in *People* v. *Terry,* 44 Cal.2d 371, 372-373 [282 P.2d 19]: 'Entrapment as a matter of law is not established where there is any substantial evidence in the record from which it may be inferred that the criminal intent to commit the particular offense originated in the mind of the accused.' In an extensive discussion of the law of entrapment in *People* v. *Benford,* 53 Cal.2d 1 [345 P.2d 928], this court, while pointing out a difference in the rules of evidence in such cases as applied in the federal courts and the courts of California (53 Cal.2d 8-12), reiterated the rule announced in the previous cases cited and quoted from above (53 Cal.2d 10), and stated the proper test to be 'not, as defendant's argument suggests, whether the prosecution has "overcome the defense of entrapment" [citation] but, as he states elsewhere in his briefs, whether the prosecution evidence as a matter of law shows entrapment.'

"Our problem is therefore to examine the evidence on this phase of the case to determine whether it shows entrapment as a matter of law, i.e., whether as a matter of law it shows that the criminal design originated not in the mind of the accused but in the mind of the officer, and that he was induced by the officer to commit a crime which he would not have otherwise committed (*People* v. *Makovsky, supra,* 3 Cal.2d 366, 369), or whether there is any substantial evidence in the record from which it may be inferred that the criminal intent to commit the particular offense originated in the mind of the accused (*People* v. *Terry, supra,* 44 Cal.2d 371, 372-373)."

It is true that the testimony of the appellant was in conflict with that of Officer Branson. But the trier of fact, in determining the credibility of the witnesses, was not required to give credence to the appellant's testimony and it is not the function of this court to reappraise its effect. (*People* v.

428

*Benford,* 53 Cal.2d 1, 5 [345 P.2d 928].) ██ Substantial support is found in the record for the trial court's conclusion that there was no entrapment. Without repeating the evidence, it is sufficient to point out that when the officer asked the appellant for marijuana, the appellant quoted the price. Before that, the officer overheard a telephone conversation between the man known as Bob and the appellant about the subject of marijuana. In the course of his initial conversation with the officer the appellant answered, "Yes," when asked if the marijuana was "good stuff." He further said that it was the same "stuff" that he had sold to Jimmy and that it was the best "weed" he had "got ahold of." ██ It is true that there were some inconsistencies in the testimony of Officer Branson, but, as stated in *People* v. *Alonzo,* 158 Cal. App.2d 45, at page 47 [322 P.2d 42] : "It is the province of the trier of the facts to pass upon the credibility of the witnesses and determine the weight that should be given to their testimony; also, to resolve any conflicts and inconsistencies in their testimony, and this rule applies to conflicts and inconsistencies in the testimony of a particular witness." ██ It was a reasonable inference that the appellant was a willing seller of the marijuana and that no more persuasion was used than is necessary in the course of an ordinary sale. (See *People* v. *Lindsey,* 91 Cal.App.2d 914, 917 [205 P.2d 1114].) Hence the judgment cannot be reversed (see *People* v. *Braddock,* 41 Cal.2d 794, 803 [264 P.2d 521]) unless there is merit in a related contention which remains to be considered.

The appellant asserts that the trial court "misconstrued the requirements of the law of entrapment." In support of his claim of prejudicial error he quotes a statement of the trial judge that the appellant was not "forced particularly to get into it to help a close relative or somebody in pain or something of that sort." The point of the appellant's criticism appears to be that a proper statement of the law as to entrapment would "not mention an application of force or limit the defense of entrapment to situations suggested by the court. . . ." It is obvious that the trial judge was not undertaking the making of a statement of the governing law. ██ But, in any event, the point lacks merit as is evident from the discussion of the applicable law found in *People* v. *Grana,* 1 Cal.2d 565, at page 571 [36 P.2d 375] : "In the course of the trial the court may entertain an erroneous opinion as to the law and tentative but wrong opinion as to

fact, and give expression thereto. None of these matters have any place upon appeal. In a criminal case tried by a judge alone an appellate tribunal will affirm or reverse the judgment of conviction upon errors of law alone. If errors of law in admitting or rejecting evidence have prevented a fair trial, or if the evidence does not support it, the judgment of conviction will be reversed. The court will not examine the trial court's remarks to discover whether or not it mentally applied the correct law as the case unfolded itself, or whether after completion of the evidence and argument it applied the correct law or reasoning in arriving at a judgment." (See *People* v. *Hudson,* 97 Cal.App.2d 572, 577 [218 P.2d 60] ; *People* v. *Lindsey,* 90 Cal.App.2d 558, 564 [203 P.2d 572] ; *People* v. *Hicks,* 115 Cal.App. 314, 315 [1 P.2d 550].)

There being no basis for a reversal, the judgment and the order denying the motion for a new trial are affirmed.

Vallée, J., concurred.

SHINN, P. J.—I concur in the judgment.

The officer testified that he had information that defendant was dealing in marijuana; he offered to buy some and defendant sold it to him. It is immaterial that defendant testified that he was persuaded by the officer to commit a crime he would not otherwise have committed. The court disbelieved him and believed the officer.

Appellant's petition for a hearing by the Supreme Court was denied January 24, 1962.