[Crim. No. 2101.   Third Dist.   Nov. 22, 1948.]

THE PEOPLE, Respondent, v. JOHN EDWARD JACKSON, Appellant.

John Edward Jackson, in pro per., for Appellant.

Fred N. Howser, Attorney General, and Doris H. Maier, Deputy Attorney General, for Respondent.

THOMPSON, J.—The defendant, a Negro, was tried with a jury and convicted of grand theft of a purse containing $257, from the person of Fred Hunt. A motion for new trial was denied. From the judgment of conviction of grand theft the defendant has appealed. The defendant was represented at the trial and upon the motion for new trial by an attorney of his own selection. But he personally gave notice of appeal and appears in this court in proper person. We shall assume his notice of appeal also includes the order denying the motion for a new trial.

The appellant contends, as he did on motion for new trial, that the verdict and judgment are not supported by the evidence and that he was not accorded a fair and impartial trial chiefly because there were no Negroes on the jury.

The judgment is adequately supported by the evidence. The prosecuting witness, Fred Hunt, testified positively that the defendant "grabbed me and put his hand in my pocket and got my wallet and took off." He was asked, "Did you see him take the wallet?" to which he replied, "Yes, sir. He take it and run." He testified that the wallet then contained $257 in greenbacks, which he had withdrawn from the bank in Davis. He had previously worked for that city as a garbage collector. He said the wallet had been tied·up in his handkerchief and placed in his right hand hip pocket. His friend, Daniel Bean, corroborated that fact. Bean testified,

"Q. Did you see his wallet? A. Yes, sir. I tied it up in the handkerchief for him. Q. And did you see him put it in his pocket? A. Yes, sir."

The uncontradicted evidence shows that Hunt had worked for the city of Davis about a year and a half, and that he had previously worked for a man by the name of Swanson for seven years. He said he drew his money from the bank and came to Sacramento, thinking he might find another job. He called upon his friend, Daniel Bean, the evening before March 22, 1948. Mr. Bean was employed at Roos Brothers mercantile store on K Street in Sacramento. Hunt had known Mr. Bean since 1946. He had previously visited with his friend Bean at Sacramento, where he "would stay sometimes three or four days." Bean testified that they had been visiting the taverns together all night long and that Hunt was quite intoxicated. About 6 o'clock on the morning of March 22d they came from Mr. Bean's house to buy a pint of whiskey.

Mr. Hunt testified in that regard:

"We came out of Bean's house and went over to the next-door neighbor and Bean got his Ford, so we went on down town after a pint of liquor, and before we got to the liquor store he [the defendant] was standing on the corner—this fellow here. Q. You mean the defendant? A. Yes. Bean stops the car and he jumps in the car and went with us. We stopped at the liquor store and went in and I paid for the liquor and I put the seven dollars back in the bill-fold with the rest of my money. I had $260.00 when I went in. . . . We went on down to the house where we got the Ford, then, over to Bean's house. We went in there and had a couple [of drinks] and Bean said, 'Let's go over to the house where he [the defendant] lives.' I says, 'Well, all right.' I was walking out the door and just as we got on the outside of the door he [the defendant] grabbed me and put his hand in my pocket and got my wallet and took off."

There were no other persons present at that time. Hunt testified that he had not taken his wallet out of his pocket after he replaced it when he bought the pint of liquor. Mr. Hunt said that when the defendant grabbed his wallet from his pocket, he ran away with it, and that both he and Mr. Bean "took out after him but we couldn't catch him." Mr. Bean fully corroborated the flight of the defendant at that time. He said that as he and Hunt started for the door of his home he heard him say "Someone got my money," and that he then saw "John [Jackson] was going down the

Alley, down towards 7th street. . . . He was going pretty fast. . . . I went on down and came on down on 'L' and I seen him, he went in the [Greyhound] bus station.'' Bean followed him into that building, but the defendant evidently passed directly through that room and out of the front entrance. Bean said he followed about a block and a half behind the defendant, and saw him heading toward the Southern Pacific depot. The defendant entered that building, and Bean followed him. He said ''He was going through there, so that's the last time I see him. . . . I went out in the S. P. Yard and looked and didn't see him.'' He was asked, ''Well, when you came out of the Greyhound Depot and you saw him, was he running or walking?'' to which he replied, ''He was running.'' That furnishes ample evidence of the defendant's flight.

■ It is true that the flight of a person who is charged with a crime, standing alone, is insufficient to establish his guilt. But it may nevertheless be competent evidence tending to show his guilt, which may be considered by the jury under a proper instruction, in deciding whether he is guilty or innocent. The weight to which the circumstance of flight is entitled is a matter for the jury to determine. (Pen. Code, § 1127c; *People* v. *Hall,* 220 Cal. 166, 173 [30 P.2d 23]; *People* v. *Arguilida,* 85 Cal.App.2d 623 [193 P.2d 478].) In the present case, although the evidence showed that after the defendant was present when Hunt disclosed the fact that he had a purse containing considerable money, and after accompanying Hunt and his friend Bean to their house where he joined in drinking some liquor with them, immediately after Hunt declared that ''someone got my money,'' the defendant hastily departed and did not return. The defendant listened to that evidence and made no attempt to contradict or explain his flight. He did not even take the witness stand in his own behalf. Certainly the jury was entitled to take into consideration that unexplained flight in determining the motive or reason for the sudden departure of the defendant. As the text in Underhill's Criminal Evidence, section 254, at page 478 states: ''The motives of his departure may be inferred from the circumstances of his flight.'' ■ We must assume the jury was properly instructed in that regard. The instructions are in no wise challenged. They are not before this court.

■ The defendant relies chiefly on the evidence that Hunt was intoxicated, and argues that he therefore did not know

what became of his wallet, and that he did not actually see the defendant take his purse. But the questions of the weight of evidence, the credibility of the witnesses and of the effect of the asserted intoxication of Hunt were solely problems for the determination of the jury, with which we may not interfere on this appeal. (*People* v. *Peinado*, 57 Cal.App.2d 704 [135 P.2d 26]; *People* v. *Bernstein*, 70 Cal.App.2d 462 [161 P.2d 381]; *People* v. *La Rocca*, 68 Cal.App.2d 652 [157 P.2d 378]; *People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778].) We conclude that the evidence amply supports the verdict and judgment in this case.

■ There is no merit in appellant's contention that he was deprived of a fair and impartial trial because no Negroes were impaneled on the jury. There was no objection to the jury which was sworn to try the case. The defendant did not move to quash the venire. No prospective Negro jurors were excluded from the jury. On motion for a new trial, Alfred P. Broughton, the Sacramento County commissioner, who drew the list of jurors from which the jury was impaneled, testified that Negroes were not excluded from the panel, and that the list contained "a reasonable proportion of the population of whites and negroes." A person on trial for an alleged crime is not necessarily entitled to have persons of his own race on the jury, nor is he deprived of vested rights or of a fair and impartial trial merely because the jury contains no persons of his own race, provided such individuals have not been deliberately or arbitrarily excluded therefrom. (*People* v. *Hines*, 12 Cal.2d 535, 539 [86 P.2d 92]; 50 C.J.S. § 195, p. 927.) In the Hines case, *supra*, in which the judgment was reversed because it appeared that all Negroes had been arbitraily excluded from the jury, the Supreme Court said:

" 'Clearly the preceding mandates imply that one who is on trial for an alleged crime is entitled to a jury from which individuals of his own race who are otherwise qualified as jurors in the particular case, have not been arbitrarily excluded merely because of their nationality, race or color. That does not mean that an accused is entitled to a jury upon which there are members of his own race. It only means that qualified jurors must not be excluded from service merely because of their nationality, race or color.' "

For the foregoing reasons the judgment and order denying the motion for new trial are affirmed.

Adams, P. J., and Peek, J., concurred.