[Crim. No. 4610.   Second Dist., Div. One.   July 18, 1951.]

THE PEOPLE, Respondent, v. SIDNEY D. CRAWFORD,
Appellant.

Allan M. Moore for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information filed by the District Attorney of Los Angeles County, the defendants were accused in Count I of the crime of conspiracy to commit grand theft, and in Count II with the offense of attempted grand theft. Though not named as a defendant, one Dyer was named in the information as a person who had participated in the alleged offenses with the defendants.

To both counts of the information each defendant entered a plea of not guilty. Following a jury trial, defendants Crawford and Atadero were found guilty as charged in each count of the information, and defendant Cabatuan was acquitted on both counts. Defendants Crawford and Atadero moved for a new trial which motion was denied. From the judgment of conviction and the order denying his motion for a new trial defendant Crawford alone prosecutes this appeal.

The grounds upon which the appeal herein is predicated make it necessary to epitomize the evidence which gave rise to this prosecution. Viewing the evidence in the light most favorable to the prosecution, as we are required to do following a conviction (*People* v. *Carothers,* 77 Cal.App.2d 252, 253 [175 P.2d 30] ; *People* v. *Cayer,* 102 Cal.App.2d 643 [228 P.2d 70] ), the record reveals testimony that Sergeant Schultz of the Los Angeles Police Department received information from his superior officers that a certain person was offering to sell stolen liquor to liquor stores. Sergeant Schultz was

instructed to contact a man named Dyer and was furnished with the latter's telephone number. Officer Waggoner was assigned to communicate with said Dyer. On July 6, 1950, Officer Waggoner telephoned to the number theretofore given him and talked to Dyer. He told Dyer his name was Johnnie Flocca, and that he owned a liquor store. He asked Dyer if he had some liquor for sale. Dyer said that he did have some and would like to talk to Waggoner. He asked him to meet him at the cornor of Jefferson Boulevard and Normandie Avenue in the city of Los Angeles later that day. Waggoner agreed to meet him as suggested. At the meeting, Dyer said that he had a carload of stolen whiskey that he would like to sell, and Waggoner said he would like to buy it. They made an appointment to meet again on the same corner at 9 a.m. on July 8th.

On July 8, Waggoner went to the corner in a private automobile and met Dyer, who represented that his name was Melvin. It was then arranged that Waggoner should meet other persons. The appellant joined them in the car and was introduced to Waggoner, who was called Johnnie, as Stanley. The appellant told Waggoner that he had a truckload of stolen whiskey and asked him if he would like to buy it, and Waggoner said he would. The appellant said Waggoner would have to talk to his partner, Dyer, about it. Dyer asked what kind of whiskey Waggoner wanted. When Waggoner asked what kind he had, Dyer said he had all kinds, which he would sell for $25 or $35 a case, depending on the brand; and that he had several cases of cigarettes, which he would sell for $25 a case.

Dyer said that he had to meet a man who had just come in on a boat, and who had some "stuff" for him. Waggoner asked him what kind of "stuff" he had, and Dyer said it was diamonds, silk and Chinese herbs. When Waggoner asked what kind of herbs, Dyer said it was opium. About that time, Atadero approached the car wearing a Merchant Marine cap. Dyer invited him into the car, and after Dyer assured him that Waggoner was a friend, Atadero got in. The appellant said, "Did you bring the stuff?" Atadero said, "Yes," and handed the appellant a small package about 3 inches by 2, wrapped in a white paper with Chinese or Japanese figures on it. The appellant opened the paper and pulled out a red can with a green wrapping around it, also containing Japanese or Chinese figures. He said, "This is the real stuff. How much do you want for it?" Atadero said, "I want $200." The appellant took out an envelope containing some money,

and counted out some currency. Atadero put the money into his pocket and the appellant said, "Have you got any more of this stuff?" Atadero said, "Yes, I have got about a hundred cans of it. I am going to get rid of it. I thought you wanted more than one can at this time." Atadero then got out of the car and left the scene.

The appellant then said, "I have got to go call the Chinaman so he can pick this stuff up right away. I want to get rid of it." He handed the can to Waggoner and said, "Will you hold onto this until I get back. I will be right back." Dyer said to Waggoner, "That is pretty good stuff that you have got there." Waggoner said, "What do you mean, 'it is pretty good stuff'?" Dyer said, "That is good opium there. Why don't you get in with Mr. Dyer (Stanley?) here and do business with him? He buys it for $200 a can and he sells it for $400. That is 100 per cent profit." The appellant came back to the car. Dyer said to Officer Waggoner, "When the Chinaman gets here, tell him that the stuff belongs to you and that you want $425 for the can. If he don't want it for $425, if he offers you $400, take it."

Cabatuan then walked up to the car and got in, after the appellant told him that Waggoner was a friend of his. Cabatuan asked to see the stuff, and inquired about the price. Waggoner told him they wanted $425. Cabatuan refused to pay $425, and offered $400. The appellant said they would take it. Waggoner handed the can to the appellant, and the appellant handed it to Cabatuan. Cabatuan pulled out a bundle of currency, counted some out and handed it to the appellant. He then left the scene.

Dyer said, "I just made $200 on this deal here." "This Filipino boy has a hundred cans of it." "I could really make a lot more money if I had enough to buy it all." "I only have $2,000." "That's only enough for 12 cans." "I sure wish I had the rest of the money." Dyer then said, "Why don't you go in with Crawford and both of you clean up on this deal?" Waggoner asked the appellant how much money he would need, and the appellant said, "I will need $7,800 more. Do you think it is possible you could raise it?" Waggoner said that he might be able to raise it, but that he would have to have a little time. The appellant said that was all right. He said, "We can sell every bit of this stuff to the Chinaman. We can sell it. We can buy it for $200 a can and sell it for $400 a can." "You see if you can raise some money . . . You make the meeting place and we will meet

there at 2:00 o'clock.'' Waggoner agreed to do so, and gave the appellant his home phone number so he could call and find out where the meeting place would be. The appellant and Dyer got out of the car.

Waggoner arranged a meeting place at a room in a motel at 2901 South Flower Street. The appellant telephoned Waggoner and learned the place of meeting. Waggoner was there at 2 p.m., and he had arranged for other police officers, Schultz, Berone and Gerissi, to be in another room of the motel. The appellant was standing outside of the room Waggoner had obtained for the meeting when Waggoner arrived there. He and Waggoner went into the room, and the appellant said it would be about 10 minutes before Atadero got there with the ''stuff.'' He asked Waggoner if he brought the money. Waggoner said he had it outside in the car. About 2:10 p.m., Atadero arrived in the room. He asked if Waggoner had brought the money, and Waggoner said that he had. Atadero then said he would go get the stuff. He then went out the door and returned in about five minutes with a small brown suitcase containing several small packages wrapped in papers with Chinese or Japanese figures on it. He said that the cans contained opium.

Waggoner said that he would like to see the ''stuff,'' so Atadero opened the suitcase and showed him one of the cans. Waggoner said he would go out to his car and bring the money in. He walked out the door and notified the other officers that it was time to come in. The other officers went to the door where the appellant and Atadero were, announced that they were police officers, and demanded to be let in. Officer Schultz tried to open the door, but could not, so he kicked it open. As they entered the room, Waggoner saw the appellant throw something onto the bed. He picked it up. It was two bundles of blank paper each with a $20 bill on top and a $1.00 bill on the bottom, and a band around it stamped $1,000. There was also money of the Japanese government and Chinese government. There was a total of $58 in American money in the bundles.

After the officers had identified themselves as such, the appellant said to Officer Waggoner, ''Well, I guess you have got me.'' ''There isn't opium in those cans.'' ''I was trying to pull the can game on you.'' ''You should have been a bunco artist like myself instead of a police officer.'' ''Instead of me buncoing you, you buncoed me.'' ''I just took a fellow out in Pomona for $1,800 about a month ago.'' ''I

was trying to take you the same way but it just backfired on me."

Later at the police station, Sergeant Schultz talked to the appellant. He asked him what kind of work he did, and the appellant answered, "You are kidding, of course." When asked again, he said, "I don't work, I am a hustler." The sergeant asked him how many times he had operated the "can game," and the appellant said, "Well, I have made quite a few big scores lately." He said he had taken two people in Pomona for $1,800 apiece, and another man for $2,600. He said he had been "working bunco" all his life. At a later conversation, Sergeant Schultz asked the appellant how he "planned on getting rid" of Waggoner if the deal had gone through, as he was of the opinion that Waggoner would have stayed close to the appellant until he sold the opium. The appellant answered, "Well, I was figuring on getting rid of him like I do the rest of the suckors." "We make the arrangement to go downtown to a hotel where this Chinese person is supposed to be living, and I have the party wait in the car and I tell them that I am going up and get the Chinaman and I go in the front door and out the back." He also said that Cabatuan, Atadero, Dyer and he had arranged to meet later, after they had obtained the money, and divide it among the four of them.

The cans in the suitcase were examined by a chemist, who opened all of those which had no factory seals on them, amounting to about two-thirds of the total. None of them contained any narcotic material. In the opinion of the chemist, based upon the weight of the other cans, they did not contain opium.

Testifying in his own behalf, the appellant stated that Dyer had called him at about 10 o'clock on the morning of July 8, 1950; that Dyer told him he had a big deal and asked him to come to his house; that he went to Dyer's house, and Dyer told him he would introduce him to a man; that they went to the corner of Normandie and Jefferson where they met a man named Johnnie, who was Waggoner, sitting in a car; that Waggoner asked him if he could get him any whiskey or cigarettes, and he said that he did not have access to any cigarettes or whiskey; that Waggoner asked him if there was anything at all that he could get to make "a quick dollar"; that he told Waggoner he knew of nothing; that Waggoner told him about a "deal" that he wanted to pull, if he could get some help; that the "deal" was to get something that

resembled dope and sell it to a man with a lot of money that he knew; and that Waggoner told him the only thing he would have to do was what Waggoner told him. He testified further that in response to Waggoner's request, he telephoned to Atadero and told him that if he was interested in a matter with quite a bit of money involved, he could come and talk it over, and then telephoned to Cabatuan and told him the same thing; that when Atadero got to the car, Waggoner told him he could sell something that was supposed to be dope, but wasn't, to a man he knew, and Atadero said he would be interested in the proposition; that Waggoner instructed Atadero to buy small cans of cloves, cinnamon, or anything else he could get that would be similar to a package of opium; and that after arranging to have the appellant telephone him and tell him of further arrangements which Waggoner would make, Atadero left. Appellant testified that after Atadero left, Cabatuan came to the car and was told what the proposition was, but that he was not interested in it and left the car; that Waggoner told appellant that he would get a place where they could meet, and that he would bring the man who was going to buy the packages; that Waggoner gave him a telephone number and told him to telephone and get the rest of the plans; that he telephoned Waggoner and got the address of the meeting place and the time of the meeting; that he, the appellant, telephoned Atadero and asked him if the things were ready, and Atadero said that they were, so he told him to bring them to the meeting place at 2:30; that he went to the motel where he met Waggoner and they entered the room; that Waggoner asked him if his money was made up to represent more than it was, as he had instructed him; that Atadero brought the cans to the room and Waggoner looked at them and said that they would do the trick; and that, saying he was going to get the fellow, Waggoner left the room, whereupon the officers came in and arrested them.

The first point raised is that the evidence clearly establishes that appellant was entrapped and that he was induced to commit the crimes in question by Police Officer Waggoner.

On numerous occasions it has been held by our state and federal courts to be the law that where an officer of the law induced an accused to commit a criminal act not contemplated by him, a conviction would be contrary to public policy. ■ In other words, that where the criminal intent originates in the mind of the entrapping person and the accused is lured into the commission of the offense charged in order to prosecute him, no conviction may be had. ■ The law does not

frown upon the entrapment of a criminal but will not tolerate the seduction of innocent people into a criminal career by its officers (*United States* v. *Wray,* 8 F.2d 429, 430). ■ Where an accused has a preexisting criminal intent, the fact that when solicited by a decoy he committed a crime raises no inference of unlawful entrapment. ■ "It is only when the criminal design is conceived in the mind of the officer, does not originate with the accused, and a decoy is used to ensnare the innocent and law-abiding by persuasion, deceitful representation, inducement or allurement into the commission of the crime, that there is entrapment" (*People* v. *Lindsey,* 91 Cal.App.2d 914, 917 [205 P.2d 1114]).

■ With the foregoing rules in mind it cannot here be held that the evidence clearly established entrapment. No more appears than a conflict in the evidence and at that, the entire story as related by appellant, coupled with his admissions of participating in previous similar sinister transactions, is of such a nature that it is difficult to see how a jury could have believed that Officer Waggoner did any more than furnish appellant an opportunity to commit the offenses charged and then aided appellant in the commission thereof in order to secure the evidence necessary to prosecute him. Such a situation furnishes no defense upon the theory of unlawful entrapment (*People* v. *Lindsey, supra,* p. 917). The jury was entitled to believe the testimony of the police officer and if they did, it showed that pursuant to the plan conceived by appellant and his codefendants, the officer was to be the victim of their scheme to secure his money in exchange for spurious opium.

■ The instructions given at the trial were not brought up on this appeal and are in nowise challenged. We must therefore assume that the theory of entrapment upon which appellant tendered his defense was fully protected by the trial judge in his instructions to the jury (*People* v. *Jackson,* 88 Cal.App.2d 747, 750 [199 P.2d 322]; *People* v. *Brown,* 72 Cal.App.2d 717, 720 [165 P.2d 707]). Under familiar rules, the finding of the jury based on conflicting but substantial evidence may not be disturbed on appeal (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]).

■ It is next contended by appellant that on two occasions during the cross-examination of defendants, the deputy district attorney was guilty of prejudicial misconduct. On the first occasion, the prosecutor was examining the defendant Cabatuan who had testified that at the request of either

Officer Waggoner or appellant he had, in New Chinatown, bought small cans and paper to wrap them, and took them to the motel heretofore mentioned. On cross-examination the deputy district attorney was vainly endeavoring to ascertain from the witness the location of the particular store in New Chinatown at which the purchase had been made. After the examination had proceeded for some time appellant's counsel objected on the ground that the witness "has testified to the best of his knowledge it was near Chinatown." Thereupon the following occurred:

"MR. MYERS: New Chinatown has not been defined yet, if the Court please. There is a question of time involved here. I would like to get some ways near where he bought this stuff.

"MR. MOORE (appellant's attorney): Counsel, if I may add, your witness there——

"MR. MYERS: It is not my witness. Just a moment please.

"MR. MOORE: My witness is not so fluent with the English language as you are.

"MR. MYERS: He is pretty clever; too clever for me."

Appellant's attorney then requested the court to admonish the jury to disregard the last quoted statement of the prosecutor.

The court then instructed the jury as follows:

"The Court will admonish the jury at this time to disregard both of the arguments and discussion of both counsel, and to treat the remarks as though you had never heard them."

Since the trial judge promptly charged the jury to disregard the statement of the deputy district attorney, there is no reversible error. In any event, the remark had no bearing upon the guilt or innocence of the appellant and therefore, was not prejudicial (*People* v. *Haughey,* 48 Cal.App.2d 506, 514 [120 P.2d 121]). We cannot conclude under the facts here present that jurors, sworn to find a true verdict, will disregard their oaths and also disobey the instructions of the court to base their verdict upon the testimony alone, and will allow themselves to be influenced by one or two casual remarks which may be made by counsel under the influence of passion, during the heat of cross-examination. The situation with which we are here confronted is not one wherein it can reasonably be said that the timely admonition to the jury did not remove the prejudicial effect, if any, resulting from the conduct of the prosecuting officer.

What we have just said is equally applicable to the second occasion during the trial when the deputy district attorney made a remark of which appellant complains and assigns as reversible error. The incident is reflected in the record as follows:

"Q. (by Mr. Myers, deputy district attorney): Now we are getting near the location. Now you went into this store, then. You say you left Mr. —— very amusing, isn't it, Mr. Cabatuan?

"You left this store——

"Mr. Moore: If the Court please——

"Mr. Myers: He is sitting there grinning at me.

"Mr. Moore (appellant's attorney): Just a moment, please, counsel. I have suffered the grins of the police officers in this court, too. I think this is very prejudicial, counsel's statement. I respect him as a man much more skilled than myself, but I don't believe his comments have any place in this courtroom when there is such a grave trial going on."

Whereupon, the court instructed the jury as follows:

"If you make an objection, the Court rules the remark of counsel was uncalled for. It was not a proper remark, and I will now admonish the jury to disregard the last remark of Mr. Myers."

Whatever prejudice, if any, resulted from the remark "He is sitting there grinning at me," was removed by the prompt and stern rebuke of the trial judge administered to the prosecutor.

Finally, appellant contends that the statements and conduct of certain police officers (one of whom was a witness against him), during the course of the trial, and in the presence of the jury, resulted in a miscarriage of justice. A perusal of the record indicates that this issue was raised on an affidavit of appellant's counsel presented on the motion for a new trial. The affidavit in question was not brought here on this appeal but from an examination of the reporter's transcript containing the arguments made at the hearing of the motion for a new trial, it appears that the affidavit asserted that at a time during the trial when the jury was leaving the courtroom, and within their hearing, Police Sergeant Schultz, one of the witnesses at the trial, said to the appellant's counsel, "You are a smart one, Mr. Moore, you are really sharp." That at another time, Officer Gerissi, one of the arresting officers in the case, but who did not testify as a

witness, said to the attorney for appellant, "Moore, you must write Hollywood stories for a detective magazine."

In his opening brief appellant contends, and in his argument on the motion for a new trial he also contended that police officers concerned in the case, "smiled and smirked" in the courtroom during the examination of appellant and his codefendants.

Assuming the statements just narrated were made, they had no bearing upon the guilt or innocence of appellant, and, as heretofore pointed out, cannot therefore, be regarded as prejudicial to his substantial rights. Furthermore, so far as the record shows, appellant failed to call the court's attention to the incidents just related until after the verdict had been rendered. ■ An accused or his counsel when in possession of knowledge, during the progress of a trial, of statements made or of the conduct of witnesses or others in the presence of the jurors, which he deems to be prejudicial, may not neglect to call the court's attention thereto, speculate upon receiving a favorable verdict, and then assign the statements or conduct as prejudicial for the first time after an adverse verdict has been returned against him (*People* v. *Quiel,* 68 Cal.App.2d 674, 680 [157 P.2d 446] ; *People* v. *Williams,* 24 Cal.App. 646, 655 [142 P. 124] ; *People* v. *Lawler,* 79 Cal.App. 207, 211, 212 [249 P. 18] ).

The trial judge was courteous and patient. Throughout the trial he was extremely careful in his rulings to safeguard the rights of appellant to a fair and impartial trial. That was all the latter was entitled to, and that he received. Appellant was fairly tried, and his conviction rests upon competent and legal evidence.

The judgment and the order by which the motion for a new trial was denied are, and each of them is affirmed.

Doran, J., and Drapeau, J., concurred.