[Crim. No. 2211. Fourth Dist. Aug. 18, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. RENE MONTE-VERDE, Defendant and Appellant.

Russell E. Parsons and Edward I. Gritz for Defendant and Appellant.

John S. Rhoades and Robert C. Baxley as Amici Curiae on behalf of Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and S. Clark Moore, Deputy Attorney General, for Plaintiff and Respondent.

CONLEY, J.*—After an extended jury trial, the defendant, Rene Monteverde was convicted of offering to sell heroin (Health & Saf. Code, § 11501); the indictment was as follows: "The said Rene Monteverde on or about the 20th day of February, 1964, in the County of San Diego, State of California, and before the finding of this Indictment, did unlawfully offer to sell, furnish a narcotic, to wit, Heroin."

The defendant's motion for a new trial and his application for probation were denied, and he was sentenced to imprisonment in the California Institution for Men at Chino; however, sentence was ordered stayed pending appeal, and bail on appeal was finally fixed at $9,000, plus a penalty assessment of $900.

---

*Assigned by the Chairman of the Judicial Council.

· The defendant makes a four-fold plea for reversal, arguing

(1) That the evidence is insufficient to convict him of a crime in California;

(2) That the court erred in refusing to instruct the jury on entrapment;

· (3) That the court committed error in excluding evidence which would have tended to establish that he had not recently fabricated his account of what happened, and that he had no intent to sell heroin;

(4) That the court erred in receiving evidence of statements made by him, contrary to the *Escobedo* and *Dorado* rule.

## ASIDE FROM THE ISSUE OF ENTRAPMENT, THE EVIDENCE WAS ADEQUATE TO PROVE THE COMMISSION OF THE CRIME.

Theodore (Ted) Heisig was the principal witness for the People. He is a treasury agent employed by the Federal Bureau of Narcotics and assigned to the Los Angeles office. He and two other federal narcotic agents, Messrs. Gjertson and Celaya, and an informant, Jerry Ellis, went to Tijuana with the purpose of finding the defendant, Monteverde, and the hope to be able to convict him, in due course, of a federal narcotics offense. On the following day, February 14, 1964, Ellis, who had previously known Monteverde, talked with him in the Coronet Room, a restaurant and bar which had been managed by him several months previously.

The defendant testified as follows:

"A. I was at the Coronet approximately at noon and I went in, like I explained to you, for my mail or something, when I was in there this Mr. Ellis, who had been previously a customer, no more than two or three times, came to me and he says, 'I want to talk to you, Tiger.' I said, 'Well, what do you want?' He says, 'I will have to talk to you outside.' So we went outside the building to the entrance of the Coronet and he says, 'I have been looking for you for the last two days.' By this I assumed that he didn't ——

: "MR. WEISMANTEL: I object to what he assumed.

· "THE COURT: Sustained.

· "BY MR. ENRIGHT: Q. Mr. Monteverde, just a minute. A. All right.

"Q. I want you to go as slowly as possible and you can't tell us what you assume or your conclusions, okay. A. Well, I have been looking for you for two days.

"Q. All right. A. I said, 'What for?' He says, 'I need a

connection.' I said, 'A connection for what?' He said 'Junk,' I said, 'Don't ever repeat that word to me again, just forget that I heard it. I don't want to ever, ever discuss this with you or anyone else.' "

Ellis described Heisig to Monteverde as a rich lawbreaker from the eastern United States, who would be interested in getting some action from the sale of heroin.

Heisig was so dressed as to enable him to play his part; he had on a black loose-knit sweater, a sport shirt and dark trousers, and he had not shaved for a day or two previously. He had a bank-roll of $4,000 with him in United States government money.

Mr. Heisig testified:

At about 2 p.m., he went to the Coronet Room, and Ellis there introduced him to the defendant. Agent Celaya had preceded him to the bar. Monteverde and Ellis were talking with two young women. Monteverde told Heisig he had heard about him and knew he was a friend of Jerry's (Ellis). Heisig told Monteverde that he had some money and he wanted to invest it; he wanted a little action. Monteverde said he would talk to him later. He conversed with the two women for awhile about operations at the Caliente Race Track. When the women temporarily left, Monteverde said to Heisig, "Ted, if you want to make some big money quick, junk is the business." The record shows that "junk" is a word commonly used to indicate heroin. Heisig told Monteverde that he thought it was dangerous, and he had read in the papers about arrests, but the latter said, "Don't worry about that, my men have been in the business over ten years, they are all right." Heisig asked how much an ounce would cost, and Monteverde said, "$350 for the best stuff." The price of heroin in Tijuana was from $200 to $500 an ounce. Monteverde referred to the ounce as a "piece."

The women returned and just as they were coming up, Monteverde said he could supply 10 ounces, and, in the presence of the women, Monteverde changed the wording of his statement to 10 "dresses." After the women left again, Monteverde said, "Ted, I want to see you, come on into the men's room." In the latter place, Monteverde asked, "Ted, are you really serious about wanting this stuff?" Heisig replied, "Yes, Rene, I have got the money," and showed Monteverde his large roll of government greenbacks; he continued, "I want delivery on the American side. I don't want to buy this heroin and pick it up in Tijuana." Monteverde

said that that should be no problem, and "I have a friend named Marcus and he has been delivering stuff to Los Angeles for the past ten years." He also said, "Marcus is well known by the border crossing people, and he is also smuggling meats and delicacies to restaurants like the Hotel Caesar in Tijuana. Marcus is trusted by the border crossing people . . . and he is never searched." Monteverde boasted that he had been "playing in junk" for about 10 years. At about this time, Jerry Ellis entered the restroom, and Monteverde suggested that a postcard be written indicating a phone number to make contact in Los Angeles, and he [Monteverde] would make arrangements to deliver 10 ounces of heroin in Los Angeles at $350 an ounce. Monteverde handed a card to Ellis, and Ellis later gave it to Heisig. The card had the imprint of a coronet on its front and the words "Coronet Room," and on the back in writing "Mr. Rene."

On February 16, 1964, Heisig mailed a postcard to Monteverde from Los Angeles. On it, he wrote a telephone number and told Monteverde to call him Wednesday or Thursday. The card read: "Hello. We are having a fine time in L. A. Why not give us a call Wednesday or Thursday night about 5 p.m. at 842 4543? The girls are friendly as always." The card was signed "J and T." The number on the card was that of the home phone of Agent Celaya. The government agents tried to reach Monteverde by telephone from Burbank, but he was not at the Coronet Room in Tijuana; Ellis then called him at his home in Imperial Beach, San Diego County, while Agents Heisig, Celaya and Borquez were present. Heisig heard a voice which he recognized as Monteverde's. He had his head right up against Ellis' head in listening; Ellis said, "Hello, why didn't you call us?" Monteverde said, "I haven't gotten the postcard." Then, Monteverde said, "Jerry, I can get you that stuff, all you want, it's no problem." Ellis said, "Wait a minute, Ted is here, I will put him on." He then said, "Hi, Rene." Monteverde said, "Hello, Ted," and then, "Ted, I can get you that 'H', it's the best in T.J." The witness testified that "H" meant heroin, and "T.J." Tijuana. Heisig asked Monteverde how much, and the latter said, "Three five zero a piece." Heisig then asked, "Can you whack it up?" And Monteverde said, "Yeah, you can cut it up four times and it would still be as good as the stuff the boys sell down on Revolution." (Revolution is a main street in Tijuana.) Monteverde said, "This white stuff is very good, my people get it from Marseilles."

The witness, Heisig, pointed out that heroin comes in two

colors—brown is usually Mexican and white is French or Italian. Monteverde said he would try to locate his man and have him deliver it. Monteverde said that to deliver in the United States would cost $50 an ounce more, and Heisig told Monteverde that was "Okay." Monteverde said, "Give me a number and I will call you at 2:30 sharp tomorrow." He was given Agent Celaya's number in Burbank, the same telephone number as was listed on the postcard.

The next day at about 2:40 p.m., a telephone call was received by the federal agents at Burbank. At that time, they were equipped with a recording device, which was hooked to the telephone by means of a suction cup; Agent Borquez had attached it. The tape recording was made and it was received in evidence at the trial. Heisig suggested that a delivery be made at a point in San Ysidro in San Diego County, and he referred to the fact that he would call Monteverde on the 27th of February at the Coronet Room which he did. At that time, he asked Monteverde how things were going, and the latter said, "Okay. I want to meet you Saturday or Sunday." The Sunday date was agreed upon and Monteverde said, he would meet him "at the Tijuana Country Club. . . . It's located just before you get to the race track." On the day suggested, Heisig went to Tijuana with Agent Gjerston, and there they first met with Federal Agent Baca, and also with Mexican narcotic agents commanded by Captain Valverde. Agent Baca of the San Diego office and Agent Gjertson checked into the La Sierra Motel. Heisig still had the $4,000 in government money in his possession. He and Agent Gjertson then drove to the Tijuana Country Club, walked into the dining area there, and ordered a sandwich. Monteverde joined Heisig about 10 minutes later; he asked what was happening, and Monteverde said he was going over and see "the man." Heisig told Monteverde he had already checked into Room 10 at the La Sierra, and Monteverde told him to go over there and wait, and that he would call him in about an hour. He said to Monteverde, "You give me the dope and I'll give you the money." Monteverde said, "Okay." Heisig and Gjertson then went to the motel room and waited. After leaving Monteverde, he made a telephone call to Agent Baca, who was with the Mexican federal police, and then returned to the motel. At 6 p.m., he heard from Monteverde, who said, "I'm outside, come out and we'll talk." Heisig went outside, and in two or three minutes he saw Monteverde in a Ford station wagon. Monteverde said he had not as yet seen "the man," but was trying to locate him and was going over to his house, and

that he wanted the money in advance. Heisig told Monteverde, "Well, we can't do that . . . it's like buying a pig in a poke, you give me the narcotics and I'll give you the $3500." While they were having that conversation, Monteverde drove in a circular route around the location of the motel and then returned to his original point of departure. Monteverde said he would go and see "Frenchy" and would return and give him a phone call; that they could meet in the men's room and that either he or someone else would turn over the narcotics. Monteverde let Heisig off at the La Sierra Motel and left. At about 7:15 p.m., he saw Monteverde outside and they nodded to each other. He then talked with Monteverde, and Monteverde said that "Frenchy" was waiting in the Chapultepec Bar, but that there was no way that he could get the narcotics without the money. Heisig said that once "Frenchy" got the money, he could not trust him. Monteverde said he would go to the Chapultepec and give one last try with "Frenchy." During this period, Heisig introduced Gjertson as a bush pilot and a friend who would fly the narcotics by way of Texas into the United Sates. After Monteverde left, Heisig called Agent Baca on his portable radio, told him that Monteverde was going to the Chapultepec Bar and suggested to Baca that he follow Monteverde.

Monteverde returned at about 9 p.m. When he got back, Agent Gjertson was there. Monteverde said that "Frenchy" Benegas would not do business without money in his hand. Heisig told Monteverde, ". . . we're not fools, we don't come down to Tijuana to lose $3500." Monteverde said that "Frenchy" Benegas and his partner, Mike Baragon, had been in business 10 years and had never been arrested. He said that he himself would receive $50 for each ounce sold, and that if Heisig wanted to he could meet Benegas and deal with him in person. After being there about 30 minutes, Monteverde left. Mr. Heisig went with Agent Gjertson to meet Agent Baca and the Mexican federal police.

He did not see Monteverde again until the next day at the Paddock Bar in San Ysidro in San Diego County. Heisig had called Monteverde's residence at about 4:30 in the afternoon. He told him that he and Gjertson had picked up some narcotics elsewhere, but that he was thankful for the help that Monteverde had given and that he would like to see him to give him some money. They met in the Paddock Bar, and at that time the federal agents told him who they were, but they were not arresting him. Heisig told Monteverde that he was going to advise the district attorney's office in San Diego that

a violation of the state law had occurred; that it is not a federal offense to offer to sell a narcotic, and the United States agents were, therefore, powerless to proceed in the federal court. Heisig said that Agent Gjertson advised Monteverde that he need not make any statement, and that he was not under arrest. However, the witness said Monteverde appeared to be quite shaken up by the disclosure, and said, ''Gee, I would like to do something to help myself out of this mess.'' Gjertson said that no federal offense was involved, and also said, ''Rene, you have constitutional rights . . . if we do come back and arrest you, then you can get yourself a lawyer and do as any prudent defendant would do under these circumstances.'' The federal officers did not specifically advise Monteverde that he could remain silent, or that he could have an attorney present at any interview, or that anything he might say might be used against him. They attempted to enlist Monteverde's services in helping to charge others with crimes relating to narcotics, including ''Frenchy'' Benegas and Mike Baragon. Monteverde said that if he helped to bring charges against them, ''they would kill me.'' He also said that Mike Baragon and ''Frenchy'' Benegas were two of the biggest drug peddlers in Tijuana, but that there were also others dealing in narcotics, and that he would try to locate some of these people. Heisig told Monteverde that if he wanted to get out of this mess, he could introduce one of their undercover agents to a narcotics peddler, and that they would take over from there. Several names were mentioned, and the effort was obviously made to induce the defendant to turn informer. However, a considerable delay of a number of days took place, and as Monteverde did not further cooperate with the federal authorities, they instigated his arrest by the state.

The law with respect to the essential elements of an offer to sell narcotics in California is well settled. A breach of the applicable statute (Health & Saf. Code, § 11501) occurs when there is an offer to sell the narcotic, accompanied by a specific intent to sell (*People* v. *Brown,* 55 Cal.2d 64 [9 Cal. Rptr. 816, 357 P.2d 1072]; *People* v. *Jackson,* 59 Cal.2d 468 [30 Cal.Rptr. 329, 381 P.2d 1]; *People* v. *Longino,* 222 Cal. App.2d 734 [35 Cal.Rptr. 367]; *People* v. *Shepherd,* 223 Cal. App.2d 166 [35 Cal.Rptr. 497]; *People* v. *May,* 224 Cal.App. 2d 436 [22 Cal.Rptr. 924]). The offer to sell does not require an actual delivery of the forbidden substance.

The evidence in this case complies with the requisites for the commission of the crime. It is true that, in addition

to the evidence relative to the offers made in California by the defendant, there is also evidence concerning the negotiations carried on in Mexico. The activities in Tijuana, of course, were a background to what happened in California and tended to indicate the mental state of the defendant. The crime, if any, must have occurred in California, but appellant's Mexican activities were properly before the jury as tending to show inferentially the intent with which the offer to sell was made in California. A breach of Mexican laws is not a crime in California; but the offer in California to sell the forbidden narcotic is specifically denounced by California law; the jury was properly instructed in that respect by the court; from the direct evidence of the conversations an inference was properly deducible as to the intent with which the offer was made, namely, the intent to sell. There was ample evidence, incidentally, to show that it was the intention of the defendant to deliver the forbidden substance in California; the fact that this intention was not carried out, and that the sale was not effectuated, does not militate against the warranted conclusion of the jury.

The appellant relies, as to this phase of the case, on the principles referred to in *People* v. *Buffum*, 40 Cal.2d 709 [256 P.2d 317] ; there cannot be a conspiracy in California to violate the criminal laws of another country, unless there is present not only the intent but an act or series of acts, which, properly considered, constitute an attempt to violate such law, or are a partial performance in this state of the crime denounced in the foreign state. This authority does not weaken the effect of the code section or the cases decided under it, which specifically denounce as a crime an offer in this state to sell the forbidden drug.

### THE INSTRUCTIONS ON ENTRAPMENT SHOULD HAVE BEEN GIVEN.

It is a fundamental rule of our criminal law that the government of the United States or of the State of California must not induce otherwise innocent people to commit crimes. As was said by Mr. Justice Roberts in his concurring opinion in *Sorrells* v. *United States*, 287 U.S. 435, 455-457 [53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 249], entrapment "attributes no merit to a guilty defendant" but is based upon the court's power and duty to preserve "the purity of its own temple." As noted in 73 Harvard Law Review, 1333, 1339: "The primary reason for government suggestion of crime is detection and cessation of a course of criminal activity which can-

not otherwise be prevented. When police inducement is employed to trap someone not engaged in such a course of activity, it has not detected crime but has merely helped to create it.''

In *Neill* v. *United States,* 225 F.2d 174, 177, it is said: ''Entrapment is the solicitation of an otherwise innocent person to commit a crime solely for the purpose of prosecution. It arises where the criminal purpose or design originated in the minds of government officials and such criminal purpose or design is implanted in the mind of an otherwise innocent person, the object being his prosecution. *Sorrells* v. *United States* (1932) 287 U.S. 435 [53 S.Ct. 210, 77 L.Ed. 413]. It may be a good defense and in cases such as the instant one, the defense of unlawful entrapment may be interposed by a defendant.''

In various discussions of entrapment in texts, law journals, and cases, it is an elementary assumption that: ''Under the doctrine of entrapment, the overt acts essential to the commission of the offense charged are assumed to have been committed by the defendant. But the criminal intent, as here also essential to the completion of the crime, is not assumed to have been established. It is assumed to be lacking when it did not originate in the mind of the defendant but was conceived in the minds of the enforcement officers for the unlawful purpose of inducing him to commit a crime.'' (*People* v. *Jackson,* 42 Cal.2d 540, 547 [268 P.2d 6].)

The proposed instructions offered by the appellant and refused by the court are as follows: ''The law does not tolerate one person, particularly a law enforcement officer, generating in the mind of another person who is innocent of any criminal purpose, the original intent to commit a crime, thus inducing such person to commit a crime which he would not have committed or even contemplated but for such inducement.

''If the intent to commit the crime did not originate with the defendant and he was not carrying out his own criminal purpose, but the crime was suggested by another person for the purpose of entrapping and causing the arrest of the defendant, then the defendant is not criminally liable for the acts so committed.''

''In considering the defense of entrapment the important question for you to determine is this: Did the defendant conceive the idea of committing the crime himself or was the idea conceived by another and suggested to the defendant for

the purpose of inducing him to commit the crime in order to entrap him and cause his arrest?''

The foregoing instructions are CALJIC (rev.ed.) Nos. 851 and 854. They are in proper form.

Before the recent decision in *People* v. *Perez*, 62 Cal.2d 769 [44 Cal.Rptr. 326, 401 P.2d 934], the right of a defendant to urge entrapment as a defense in California required that there should be an explicit, or at least an implied, admission by defendant that the acts constituting the crime of which he was accused had in fact been committed. (See *People* v. *Perez, supra,* 62 Cal.2d 769, 776 (fn. 2).) ▪▪▪ It is no longer necessary, in order to invoke that defense, that a defendant must admit the performance of the acts denounced as criminal. The opinion written by Mr. Chief Justice Traynor provides (62 Cal.2d 769, 775): ''Although the defense is available to a defendant who is otherwise guilty *(People* v. *Benford,* 53 Cal.2d 1, 9 [345 P.2d 928]), it does not follow that the defendant must admit guilt to establish the defense. A defendant, for example, may deny that he committed every element of the crime charged, yet properly allege that such acts as he did commit were induced by law enforcement officers. *(People* v. *West,* 139 Cal.App.2d Supp. 923, 926 [293 P.2d 166]; *Henderson* v. *United States* (5th Cir.) 237 F.2d 169, 173.) Moreover, a defendant may properly contend that the evidence shows unlawful police conduct amounting to entrapment without conceding that it also shows his guilt beyond a reasonable doubt. When the evidence does show such conduct, the court has a duty to root its effects out of the trial upon its own initiative if necessary. (See *Sorrells* v. *United States,* 287 U.S. 435, 453, 457 [53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 249] [Roberts, J., concurring].) Entrapment is recognized as a defense because 'the court refuses to enable officers of the law to consummate illegal or unjust schemes designed to foster rather than prevent and detect crime.' *(People* v. *Benford,* 53 Cal.2d 1, 9 [345 P.2d 928]; see *People* v. *Cahan,* 44 Cal.2d 434, 445-446 [282 P.2d 905, 50 A.L.R.2d 513].) A rule designed to deter such unlawful conduct cannot properly be restricted by compelling a defendant to incriminate himself as a condition to invoking the rule.''

If there is substantial evidence raising the issue of entrapment, such instructions should be given. *(People* v. *Gallagher,* 107 Cal.App. 425 [290 P. 504]; *People* v. *Alamillo,* 113 Cal. App.2d 617, 620 [248 P.2d 421]; 14 Cal.Jur.2d, Criminal Law, § 205, p. 449 et seq.)

As is said in *People* v. *Crawford,* 105 Cal.App.2d 530, 536-537 [234 P.2d 181] : "On numerous occasions it has been held by our state and federal courts to be the law that where an officer of the law induced an accused to commit a criminal act not contemplated by him, a conviction would be contrary to public policy. In other words, that where the criminal intent originates in the mind of the entrapping person and the accused is lured into the commission of the offense charged in order to prosecute him, no conviction may be had. The law does not frown upon the entrapment of a criminal but will not tolerate the seduction of innocent people into a criminal career by its officers (*United States* v. *Wray,* 8 F.2d 429, 430). Where an accused has a preexisting criminal intent, the fact that when solicited by a decoy he committed a crime raises no inference of unlawful entrapment. 'It is only when the criminal design is conceived in the mind of the officer, does not originate with the accused, and a decoy is used to ensnare the innocent and law-abiding by persuasion, deceitful representation, inducement or allurement into the commission of the crime, that there is entrapment' (*People* v. *Lindsey,* 91 Cal.App.2d 914, 917 [205 P.2d 1114])."

*People* v. *Castro,* 167 Cal.App.2d 332, 337 [334 P.2d 602], correctly states: ". . . the existence or nonexistence of entrapment is a question of fact. . . ." (See also *People* v. *Gutierrez,* 128 Cal App.2d 387, 390 [275 P.2d 65].)

The record here shows that the federal narcotic agents, three in number, and an informer at one time connected with racetrack operations and recently unemployed converged on Tijuana, and after looking for the defendant during the better part of two days finally located him at the Coronet Room. The former racetrack employee had a bank roll of $1,500 in United States government money, and the agent Heisig $4,000 in federal greenbacks. Heisig was dressed to conform with what he thought was the image of a professional lawbreaker from the eastern United States; he appeared with a two-day growth of beard and in a set of casual clothing, which made him appear to be other than what he naturally was; his semi-disguise made him out as a rich hanger-on of questionable enterprises, operating across the line of criminality. Ellis and Heisig requested Monteverde to sell heroin to them, and Heisig backed up the solicitation by flashing a $4,000 government roll of 20's, after Ellis had already shown the $1,500 owned by the United States, which had been entrusted to him. There was

no objective evidence that Monteverde had ever previously indulged in lawbreaking, but on the contrary his reputation was good. He was no longer employed either as manager of the Coronet Room, or otherwise, and it might be deduced that he needed money. The exhibition of the $4,000 and the $1,500 was unquestionably designed to, and did, furnish temptation particularly in the fetid moral atmosphere of a border town. It is also a fair deduction from the evidence that he did not possess a stock of heroin; in this instance he apparently depended wholly upon convincing a well-known local character named ''Frenchy'' Benegas to furnish the forbidden drug, with a commission payable to himself. These observations could properly be considered by a jury; the defense of entrapment was available to Monteverde. (22 C.J.S., Criminal Law, § 45(1), p. 137 et seq.; § 45(4), pp. 149-151.)

It should be noted, also, that 21 residents of San Diego County, all of them apparently solid citizens and holding substantial positions, some of them lawyers and heads of corporations and some former officials, testified to Monteverde's general reputation for truth and veracity.

Curiously enough, if objection had been made by the People to this testimony, the evidence presumably would have been excluded, for Monteverde had not been attacked with respect to his veracity as a witness, and from the standpoint of a general defense ''It is only as to the traits of character involved in the crime charged that evidence of the good character of the accused is admissible, including his reputation as a law abiding citizen.'' (18 Cal.Jur.2d, Evidence, § 159, p. 617; *People* v. *Fair,* 43 Cal. 137, 148; *People* v. *Beltram,* 94 Cal.App.2d 197, 209 [210 P.2d 238].) Testimony as to an element of character not involved in the crime for which defendant is on trial is not admissible. (*People* v. *Chrisman,* 135 Cal. 282, 288 [67 P. 136]; *People* v. *Pettinger,* 94 Cal.App. 297, 302 [271 P. 132].) But no objection was made and, as the evidence was admitted, it deserved some consideration by the jury in determining whether the defendant possessed the evil intention of selling narcotics prior to his temptation by the federal officials.

Every man accused of crime is entitled to have his defenses properly presented in an understandable manner. We believe that the defendant was here deprived of a right which was basic; the failure to permit a presentation of this defense constituted a miscarriage of justice. (*People* v. *Gallagher, supra,* 107 Cal.App. 425, 428.)

### THE COURT ERRED IN RULINGS ON THE EVIDENCE

■ Appellant contended that he was induced to believe that Heisig was actually a person named Sullivan, wanted by the F.B.I. for killing two policemen and robbing a bank in the eastern part of the United States; and that an F.B.I. agent, named Gerry of the San Diego office, had exhibited to him a poster or "wanted-flyer" containing the picture and a description of the missing criminal prior to the 14th of February when he first saw Heisig; Monteverde averred that he continued his contact with Heisig and made various statements to him relative to the proposed sale of heroin, in order to help capture Heisig-Sullivan, and, incidentally, to earn a cash reward for this service. The main trouble with this defense was that the F.B.I. agent testified that the first exhibition of the poster, and his original reference to Sullivan, occurred on February 19, some five days after the first meeting between Monteverde and Heisig. In an attempt to support other evidence offered by him in conformity with his claim, the defendant tendered the testimony of a lawyer-friend, who is one of the *amici curiae* on this appeal, Mr. John S. Rhoades; the witness was asked to give an account of a conversation between Gerry and Monteverde early in March, in which reference was presumably made to the original date of the exhibition of the poster. A second adverse ruling related to the testimony of a friend of Mrs. Monteverde as to an alleged conversation between them with respect to the "wanted-flyer" several days before the 14th of February. Both of these elements of evidence were justified on the ground that they would have tended to substantiate the contention of defendant that his story was not an afterthought, and that the appellant was right as to the time of the exhibition to him of the poster. They should have been admitted. It was for the jury to determine the facts; we cannot assume that the jury would not have found that the weight of the evidence established this defense if these two witnesses had been allowed to testify.

### EVIDENCE OF THE STATEMENTS OF THE DEFENDANT WERE NOT IMPROPERLY RECEIVED NOTWITHSTANDING THE ESCOBEDO AND DORADO RULE

■ Early in March, when the federal officials disclosed their identity to the appellant, he was told that he was not under arrest by them, and his services as an informer were then solicited by them. It is now claimed that the rule in the

*Escobedo* case (*Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]) and in the *Dorado* case (*People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]) made whatever testimony resulted from this conversation wholly inadmissible. It should be noted in passing that much of the account of what was said was brought out by cross-examination on behalf of the defendant, and ordinarily a defendant may not complain of the introduction of evidence which he himself produces. (*People* v. *Harby,* 51 Cal.App.2d 759, 769 [125 P.2d 874].) However, if the prosecution had offered all of the evidence, it would still have been admissible. At the meeting between Monteverde and the federal agents, the latter were only trying to get appellant to co-operate with them in the criminal investigation of narcotics. Appellant was told that he was not under arrest, and, of course, the federal agents had no authority as such to arrest him, because he was not accused of violating any federal law.

It is necessary to inform a defendant of his constitutional rights, under the *Dorado* rule, if the following elements are present:

(1) The investigation is no longer a general inquiry into an unsolved crime but suspicion has begun to focus on a particular suspect;

(2) The suspect is in custody;

(3) The authorities are carrying on a process of interrogation that lends itself to eliciting incriminating statements. (*People* v. *Dorado, supra,* 62 Cal.2d 338, 353-354; *People* v. *Stewart,* 62 Cal.2d 571, 576 [43 Cal.Rptr. 201, 400 P.2d 97].)

Monteverde was not under arrest. The federal agents did not interrogate him for the purpose of eliciting a confession, but instead were attempting to secure his aid in conducting an investigation of criminal activity by others; the conversation was still a general investigation of the narcotics situation so far as these agents were concerned, and there was no unsolved federal crime. The evidence was admissible.

The judgment is reversed.

Brown (Gerald), P. J., and Coughlin, J., concurred.

A petition for a rehearing was denied September 10, 1965.